Susan CAMPBELL, Etc.,
Plaintiff–Appellee,

v.

ST. TAMMANY PARISH SCHOOL BOARD, Etc., Defendant–
Appellant.

Joseph DELCARPIO, Etc., et al., Plaintiffs–Appellees,

v.

ST. TAMMANY PARISH SCHOOL BOARD, Etc., Defendant–
Appellant.

No. 94–30594.

United States Court of Appeals,
Fifth Circuit.

Sept. 15, 1995.

---

Kenneth F. Sills, Hammonds & Sills, Baton Rouge, LA, for appellant.

James R. Hashek, New Orleans, LA, John H. Cobb, John H. Pickering, Wilmer, Cutler & Pickering, Washington, DC, Marjorie Heins, ACLU Foundation, New York City, for appellee.

Before WISDOM, KING and WIENER, Circuit Judges:

WIENER, Circuit Judge:

In this case involving a First Amendment challenge to the removal of a book from all of the public school libraries in St. Tammany Parish, Louisiana, we review a ruling of the district court in which it found the St. Tammany Parish School Board's decision to remove the book unconstitutional and granted summary judgment to the parents who had objected to the book's removal. Our *de novo* review of the summary judgment evidence leads us to conclude that a genuine issue of material fact exists regarding whether the School Board removed the book for constitutionally impermissible reasons. We therefore reverse the district court's grant of summary judgment.

1. According to the Book, voodoo originated from African slaves' religious practices in Roman Catholic areas of the New World, such as Spain, Haiti, and the Dominican Republic, that were continued in North America, whereas hoodoo is traceable to the influence of Protestant religious practices on African tribal religion, having evolved from slaves that were transported from British-held territories, most notably Jamaica.

2. A representative example of the over 220 spells outlined in the book, taken from the chapter "To Do Ill," reads as follows:

I

## FACTS AND PROCEEDINGS

The instant case centers on the decision of the St. Tammany Parish School Board (School Board) to remove the book *Voodoo & Hoodoo* (Book), by Jim Haskins, from the public school libraries of the parish. Facially serious and scholarly, the Book traces the development of African tribal religion, its transfer to and evolution in the New World after slaves were brought from West Africa, and its survival in the United States through the current practice of two variations of the original African religion, voodoo and hoodoo.[1] Most of the first half of the Book discusses the evolution and practice of voodoo and hoodoo in African–American communities in this country, including in New Orleans, Louisiana. The second half of the Book is devoted to a presentation of "spells," "tricks," "hexes," "recipes," (spells) that outline, in how-to form, the way to bring about particular events.[2] The spells are presented under four categories: "To Do Ill," "To Do Good," "In Matters of Law," and "In Matters of Love."

Early in 1992, Kathy Bonds, the parent of a seventh-grade girl enrolled in a St. Tammany Parish junior high school, discovered a copy of the Book in her daughter's possession. This copy of the Book came from the library of her daughter's school. After looking through the Book, Bonds telephoned the assistant principal at the daughter's school and objected to the Book's contents. Bonds also contacted a friend who was a member of the Louisiana Christian Coalition and gave that copy of the Book to her.

Obtain a piece of the intended victim's hair and a piece of his clothing. Write the person's name and age on a piece of parchment and put all three items in a bag with some graveyard dust. Bury the bag under the person's doorstep. The victim will lose all his energy and never regain it as long as the bag is undisturbed.

Most of the objectionable spells, which constituted a small portion of the book, were outlined in either the chapter entitled "To Do Ill" or the chapter entitled "In Matters of Love" and contained references to the use of menstrual blood, pubic hair, semen, urine, and excrement.

Pursuant to the School Board's written policies and procedures regarding challenged library materials,[3] Bonds filed a formal complaint with the school principal. The crux of her complaint was that the Book heightened children's infatuation with the supernatural and incited students to try the explicit "spells," which she believed to be potentially dangerous. In response to Bond's complaint, the principal organized a school-level committee to review the matter.[4]

After considering Bond's complaint, the school-level committee unanimously recommended retaining *Voodoo & Hoodoo* in the school's library, albeit on a specially-designated "reserve" shelf available only to eighth-grade students who had obtained written permission from their parents to check out the Book. This school-level committee found that the Book was educationally suitable and stated that it "fulfill[s] the purpose for which it was selected, that is, to offer supplemental information/explanation to a topic included in the approved 8th grade Social Studies curriculum."

Clearly not satisfied with the school-level committee's recommendation, Bonds filed an appeal. The superintendent of the St. Tammany Parish public school system, pursuant to the School Board's procedures, appointed seven persons to a parish-wide committee (Appeals Committee)[5] to review the school-level committee's decision. The Appeals Committee, with only one member dissenting, agreed with the school-level committee's recommendation that the Book should be retained, but with restricted access. The lone dissenter was School Board member Robert Womack, whose Minority Report submitted after the Appeals Committee vote stated that the Book "promotes extremely unhealthy practices that are not conducive to sound moral values" and that "at a time when there is a resurgent interest in the occult and the supernatural, we do not need books like *Voodoo and Hoodoo* in our libraries."

Still undaunted, Bonds appealed that decision to the St. Tammany Parish School Board.[6] At the meeting in which the School Board reviewed the objections to the Book's presence in the school library, a member of the Louisiana Christian Coalition gave a speech in which she told the School Board that the Book contained a " 'how to' section on voodoo spells that encourage[d] harmful, antisocial behavior among young readers." She also presented to the School Board (1) a written statement objecting to the Book's presence in the school libraries "based on our belief that the manner in which the subject matter is presented constitutes an advocacy of practices of the voodoo religion" and (2) a petition containing 1,600 signatures urging removal of the Book from the parish school libraries. In addition, the School Board heard a presentation by the Appeals Committee outlining the process for challenging library materials and reporting the Appeal Committee's recommendation that the Book be placed in the reserve reference collection for eighth-grade students who had parental

---

3. The School Board's *Library Media Director's Handbook* outlined the procedures for handling complaints about library materials.

4. The school-level committee, according to the *Library Media Director's Handbook*, must consist of five members: the principal or his designee, one member of the school's teaching staff chosen by the faculty, one member of the school library's professional staff chosen by that staff, one parent from the school's PTA chosen by the PTA's executive board, and one student chosen by the student governing body or by the principal (if no student representative is included, then another member of the school's teaching staff fills the fifth position).

5. The *Library Media Director's Handbook* states that the following persons must serve on the Appeals Committee: the Assistant Superintendent of Curriculum and Instruction, one member of the School Board, the President of the St. Tammany Parish Library/Media Directors Association, the President of the St. Tammany District PTA, and three teachers currently teaching at the grade level for which the challenged book is designed.

6. The fourteen voting members of the School Board were A.R. Smith, Dr. E. Roth Allen, Dr. Paul C. Beisenherz, Calvin J. Campeaux, Jr., Eddie Fielding, Earl T. Graves, Robert C. Lehman, Gregory J. Saurage, Anthony J. Tedesco, Betty Verzwyvelt, Virgil R. Ward, Jr., Charles F. Williams, Robert R. Womack, and Patti D. Young.

permission to check the Book out of the library.

School Board member Womack, who had been the lone dissenter on the Appeals Committee, made a motion to remove *Voodoo & Hoodoo* from all of the libraries in the St. Tammany Parish public school system. In response, another School Board member, Robert Lehman, made a substitute motion to remove the Book from the schools and donate them to the public libraries. Lehman's substitute motion failed in a 7–7 tie vote. The School Board subsequently voted 12–2[7] in favor of Womack's motion to remove *Voodoo & Hoodoo* from all parish school libraries. In voting to remove the Book from the shelves altogether, the School Board did not express any opinion on the merits of the recommendations from the two committees that had reviewed the Bonds complaint previously. Neither did the School Board state the reason for its removal action.

The plaintiffs, parents of children enrolled in St. Tammany Parish schools (Parents),[8] filed a lawsuit against the School Board, alleging that, based on 42 U.S.C. § 1983 and 28 U.S.C. § 2201, the School Board's removal of *Voodoo & Hoodoo* from the public school libraries in St. Tammany Parish violated their children's First Amendment rights. The Parents filed a motion for summary judgment, which the court denied. After a trial date had been set, the Parents filed a second motion for summary judgment.

The district court granted the Parents' second summary judgment motion, ruling that there was no genuine issue of material fact in dispute. In so doing, the court stated that, by removing *Voodoo & Hoodoo* from all public school libraries in St. Tammany Parish, the School Board "intended to deny students access to the objectionable ideas contained in the book, particularly the descriptions of voodoo practices and religious beliefs." In addition to granting the Parents' motion for summary judgment, the court also ordered the School Board to replace all copies of *Voodoo & Hoodoo* that had been removed from the public school libraries. The School Board timely appealed the district court's ruling.

## II

## ANALYSIS

We review the district court's grant of summary judgment by "reviewing the record under the same standards which guided the district court." [9] Summary judgment is proper when the moving party establishes, through affidavits and other competent summary judgment evidence, that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[10] If the evidence, viewed in the light most favorable to the nonmoving party, could not lead a rational trier of fact to find for the nonmoving party, then no genuine issue for trial exists.[11]

Our *de novo* review starts with an acknowledgment that public school officials have broad discretion in the management of school affairs and that the courts should not lightly interfere with the "daily operation of

---

7. Members Smith, Allen, Fielding, Graves, Lehman, Saurage, Tedesco, Verzwyvelt, Ward, Williams, Womack and Young voted for removal of the book. Members Campeaux and Beisenherz voted against the motion to remove the book. One member of the School Board did not attend the meeting in which the vote was taken.

8. The original plaintiff was Susan Campbell, whose seventh-grade daughter attended a parish school. On March 29, 1993, the district court granted her motion to voluntarily dismiss her suit without prejudice. In February 1993, three sets of parents—Joseph and Kathryn C. Delcarpio, Jerry R. and Janet D. Bohannan, and James

W. and Judith Y. Robertson—filed a complaint that was essentially the same as Susan Campbell's complaint. One of these sets of parents, the Robertsons, have moved away from Louisiana and no longer pursue any interest in the instant case.

9. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988).

10. See Fed.R.Civ.P. 56(c).

11. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

school systems."[12] School officials' legitimate exercise of control over pedagogical matters must be balanced, however, with the recognition that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[13] Mindful of the significant competing considerations at the core of this First Amendment book removal case, we turn to an examination of the relevant caselaw to ascertain what factual issues are material.

### A. Supreme Court Guidance

The Supreme Court has repeatedly recognized that the broad authority of school officials over educational matters must be exercised in a manner that comports with fundamental constitutional safeguards.[14] Applying this concept in a case similar to this one, the Court in Board of Education v. Pico[15] considered the issue whether school officials acted properly in removing nine books from libraries in the public school district. A plurality of the Supreme Court in Pico first outlined the nature of the students' First Amendment rights and subsequently concluded that, based on the evidentiary materials in the record, a genuine issue of fact existed as to whether the school officials had exceeded First Amendment limitations on their discretion to remove library books from the schools. The Pico plurality stressed the "unique role of the school library" as a place where students could engage in voluntary inquiry.[16] It also observed that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding" and that the school library served as "the principal locus of such freedom."[17]

The Pico plurality recognized that the high degree of deference accorded to educators' decisions regarding curricular matters diminishes when the challenged decision involves a noncurricular matter.[18] Emphasizing the voluntary nature of public school library use, the plurality in Pico observed that school officials' decisions regarding public school library materials are properly viewed as decisions that do not involve the school curriculum and that are therefore subject to certain constitutional limitations.[19]

In rejecting the school officials' claim of absolute discretion to remove books from their school libraries, the Pico plurality recognized that students have a First Amendment right to receive information and that school officials are prohibited from exercising their discretion to remove books from school library shelves "simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'"[20] The Pico plurality observed that if school officials intended by their removal decision to deny students access to ideas with which the school officials disagreed, and this intent was the decisive factor in the removal decision, then the school officials had "exercised their discretion in violation of the Constitution."[21] The Court in its plurality opinion implicitly recognized, however, that an unconstitutional moti-

---

12. Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

13. Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).

14. See Tinker, 393 U.S. at 505–07, 89 S.Ct. at 736; Epperson, 393 U.S. at 103–05, 89 S.Ct. at 270; West Virginia Board of Education v. Barnette, 319 U.S. 624, 637–38, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

15. 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982).

16. Id. at 868–69, 102 S.Ct. at 2809 (plurality opinion) (citations omitted).

17. Id.

18. See id. at 868–70, 102 S.Ct. at 2809.

19. See id.

20. Id. at 872, 102 S.Ct. at 2810 (citing West Virginia Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943)).

21. Id. The Pico plurality explained that a "decisive factor" was one that was a "substantial factor" in the absence of which the opposite decision would have been reached. See id. at 871 n. 22, 102 S.Ct. at 2810 n. 22 (citing Mt. Healthy City School Dist. Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)).

vation would not be demonstrated if the school officials removed the books from the public school libraries based on a belief that the books were "pervasively vulgar" or on grounds of "educational suitability."[22]

■ Even though the constitutional analysis in the *Pico* plurality opinion does not constitute binding precedent, it may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives. The Supreme Court has previously stated that, in cases in which there is no clear Supreme Court majority, courts should look to "that position taken by those Members who concurred in the judgments on the narrowest grounds."[23] Justice White's concurrence in *Pico* represents the narrowest grounds for the result in that case, and it does not reject the plurality's assessment of the constitutional limitations on school officials' discretion to remove books from a school library. The concurrence merely states that the procedural posture of the case did not require addressing the constitutional questions presented because a material issue of fact existed, precluding summary judgment.[24]

We disagree with the School Board's contention that we are bound to reject the guidance found in *Pico* because of our *en banc* opinion in *Muir v. Alabama Educational Television Commission*.[25] In a footnote in *Muir*, Judge Hill addressed the relevance of *Pico* to the case then before the panel.[26] Judge Hill distinguished *Pico* on the grounds that *Muir* did not involve the removal of books from a public school library, but rather concerned a public television station's decision to cancel a controversial program that had previously been scheduled for broadcast.[27] Judge Hill alternatively noted that

the "no-clear-majority" nature of *Pico* meant that its First Amendment analysis did not have *precedential* value.[28] Yet nowhere in the *Muir* opinion did Judge Hill suggest that the *Pico* plurality does not provide useful guidance in determining the constitutional implications of removing books from a public school library.

Although the result in *Pico* was a remand to the district court for further development of the record, we do not read *Pico* as establishing a *per se* rule, requiring a merits trial in *every* instance in which a court must decide the constitutionality of removal of a school library book. In *Pico*, a majority of the court concluded that, based on that case's summary judgment record, material issues of factual dispute existed regarding the school officials' motivation in removing the books that precluded a summary judgment determination. Having examined the relevant caselaw, limited as it is, we now turn to an examination of the summary judgment evidence in the instant case to determine whether any issues of material fact exist here.

### B. Summary Judgment Evidence

■ As reflected by the record in the instant case, the students attending the St. Tammany Parish public schools are not required to read the books contained in the libraries; neither are the students' selections of library materials supervised by faculty members—thus, the School Board's decision to remove *Voodoo & Hoodoo* concerns a noncurricular matter.[29] As such, the School Board's decision to remove the Book must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter.[30]

22. *See id.* at 870–72, 102 S.Ct. at 2810.

23. *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977); *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976).

24. *Pico*, 457 U.S. at 882–86, 102 S.Ct. at 2816–17 (White, J., concurring in the judgment).

25. 688 F.2d 1033 (5th Cir.1982).

26. *See id.* at 1045 n. 30.

27. *See id.*

28. *See id.*

29. *See Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271–72, 108 S.Ct. 562, 570, 98 L.Ed.2d 592 (1988) (finding that curricular matters are those that "the public might reasonably perceive to bear the imprimatur of the school").

30. *See Pico*, 457 U.S. at 866–68, 102 S.Ct. at 2808 (plurality opinion) (school officials' discretion is not absolute when their exercise of that

The Supreme Court has held, however, that the key inquiry in a book removal case is the school officials' substantial motivation in arriving at the removal decision.[31] We find that the record evidence before us, comprising the depositions of eight of the twelve School Board members who voted to remove the Book and the transcript of the meeting at which the vote took place, is not sufficiently developed to permit a summary judgment determination.

Our careful consideration of the School Board members' statements as contained in the record leaves us unable to declare, as a matter of law, that the School Board's vote to remove *Voodoo & Hoodoo* from all of the parish public school libraries was substantially based on an unconstitutional motivation. At this stage, we simply do not have a full picture of the reasons why the School Board members constituting the majority voted to remove the Book. Our examination of the eight depositions reveals varying reasons for the individual School Board members' decisions to remove the Book; moreover, our only view into the motivations of the four remaining School Board members who voted to remove the Book are their short remarks at the meeting.

A trial, requiring testimony from all of the School Board members and permitting cross-examination probing their justifications for removing the Book, will enable the finder of fact to determine the genuine issue of material fact that is at the heart of this First Amendment case—the true, decisive motivation behind the School Board's decision. We therefore hold that summary judgment for the Parents was inappropriate, as the evidence did not, when viewed in the light most favorable to the School Board, foreclose the possibility that the School Board exercised its discretion within the confines of the First Amendment.[32]

Although our examination of the summary judgment evidence ultimately leads us to remand the instant case for further development of the record, we are moved to observe that, in light of the special role of the school library as a place where students may freely and voluntarily explore diverse topics, the School Board's non-curricular decision to remove a book well after it had been placed in the public school libraries evokes the question whether that action might not be an unconstitutional attempt to "strangle the free mind at its source."[33] That possibility is reinforced by the summary judgment evidence indicating that many of the School Board members had not even read the book, or had read less than its entirety, before voting as they did; many had done nothing more than browse through the book, while others had read only the several excerpts selected and furnished by a representative of the Louisiana Christian Coalition. Moreover, we note that the School Board's failure to consider, much less adopt, the recommendation of the two previous committees to restrict the Book's accessibility to eighth-graders with written parental permission but to leave the Book on the library shelf—in apparent disregard of its own outlined procedures[34]—has the appearance of "the antithesis of those procedures that might tend to

---

discretion involves contents of school library that are not required reading, as distinguished from matters of *curriculum* ).

31. *See id.* at 870–72, 102 S.Ct. at 2810.

32. *See Honore v. Douglas,* 833 F.2d 565 (5th Cir.1987) (observing in First Amendment case that "summary judgment is ill-suited for credibility determinations" and "[i]t is likewise an inadequate procedure for sorting out nebulous questions of motivation"); *Porter v. Califano,* 592 F.2d 770, 778 (5th Cir.1979) ("[a]s a general rule a court should use Rule 56 summary judgment most sparingly in a First Amendment case ... involving delicate constitutional rights, complex fact situations, disputed testimony, and questionable credibilities").

33. *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). *See also Pratt v. Indep. School Dist. No. 831,* 670 F.2d 771, 779 (8th Cir.1982) (recognizing "chilling effect" of removing films from school curriculum, which clearly indicated that ideas. contained in films were unacceptable and should not be discussed or considered).

34. The *Library Media Director's Handbook* states that on an appeal from the Appeals Committee, "[t]he St. Tammany Parish School Board shall vote on the recommendation of the Appeals Committee."

allay suspicions regarding [the School Board's] motivations."[35]

The circumstances surrounding the School Board's vote to remove the Book cannot help but raise questions regarding the constitutional validity of its decision. Nevertheless, as we are unable at this juncture to identify, as a matter of law, the single decisive motivation behind the School Board's removal decision, we have no sound basis on which to test that decision for compliance with the requirements of the First Amendment. In the absence of an undisputed statement by the School Board as a single voting body, we are faced with diverse, conflicting and frequently ambivalent statements of twelve individuals, which statements need to be further developed at trial. Thus, acknowledging the significant implications involved in balancing First Amendment concerns with the discretion of public school officials to set and administer educational policy, we leave to the fact-finder the weighty task of determining, after a full development of the factual record, the actual motivation behind the School Board's removal of the Book from all of the public school libraries in the parish.

## III

## CONCLUSION

Construing the summary judgment evidence in the instant case in the light most favorable to the School Board, we cannot conclude as a matter of law that a genuine issue of material fact does not exist as to whether the motivating factor behind the School Board's decision to remove *Voodoo & Hoodoo* was one that violated the students' First Amendment right freely to access ideas and receive information. Further development of the record is necessary to determine whether the School Board exercised its discretion over educational matters in a manner that comports with the First Amendment. Accordingly, we reverse the district court's grant of summary judgment in favor of the Parents and its judgment declaring that the School Board's removal of *Voodoo & Hoodoo*

from all of the St. Tammany Parish public school libraries was unconstitutional, and we remand the case to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.

---

35. *Pico*, 457 U.S. at 875, 102 S.Ct. at 2812 (plurality opinion); *see also Keyishian v. Board of Regents*, 385 U.S. 589, 601–05, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967) (observing that "[t]he danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform ... what is being proscribed").