Stevana CASE, et al., Plaintiffs,

v.

**UNIFIED SCHOOL DISTRICT NO. 233, Johnson County, Kansas, et al., Defendants.**

No. 94–2100–GTV.

United States District Court, D. Kansas.

Nov. 29, 1995.

J. Eugene Balloun, John T. Bullock, David J. Waxse, Shook, Hardy & Bacon, P.C., Overland Park, KS, Marjorie Heins, American Civil Liberties Union, New York City, for plaintiffs.

James R. Goheen, Daniel B. Denk, Gregory P. Goheen, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, Michael G. Norris, Norris, Keplinger & Logan, L.L.C., Overland Park, KS, for defendants.

### MEMORANDUM AND ORDER

VAN BEBBER, District Judge.

### I. Introduction

This case involves plaintiffs' challenge of the decision of the Board of Education of Unified School District No. 233 of Johnson County, Kansas, and its superintendent to remove a book entitled *Annie on My Mind* from the school libraries. Plaintiffs' claims, brought pursuant to 42 U.S.C. § 1983, allege that defendants violated plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution and § 11 of the Bill of Rights to the Kansas Constitution. Plaintiffs seek injunctive and declaratory relief.

A trial to the court was held on September 20, 21, 22, and October 4, 1995. After careful consideration of the evidence and arguments in this case, the court concludes that defendants unconstitutionally removed *Annie on My Mind* from the school libraries.

Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

### II. Findings of Fact

#### A. Parties

1. Plaintiff Stevana Case is a 1994 graduate of Olathe East High School and is a resident of Olathe, Kansas. She attended Olathe East High School from 1991–94.

2. Plaintiff Andy Case is Stevana Case's brother. He is currently a junior at Olathe North High School. He attended Oregon Trail Junior High School in the defendant school district during the 1993–94 academic school year.

3. Plaintiff Steven Case is the father of Stevana and Andy Case. He is a science teacher at Olathe East High School.

4. Plaintiff Amanda Greb is a 1994 graduate of Olathe South High School. She attended Olathe South High School from 1991–94.

5. Plaintiff Cynthia Greb is the mother of Amanda Greb and is a resident of Olathe, Kansas. She also has a son, Joe Greb, who is a junior at Olathe East High School.

6. Plaintiff Rebekka Kamberg is a 1995 graduate of Olathe South High School. She attended Olathe South High School from 1992–95.[1]

7. Plaintiff Mary–Lane Kamberg is the mother of Rebekka and Johanna Kamberg. She is a resident of the defendant school district.

8. Plaintiff Sam Pierron is a 1994 graduate of Olathe South High School. He attended Olathe South High School from 1991–94.

9. Plaintiff Abby Pierron attends Frontier Trail Junior High School in the defendant school district, and is in the eighth grade.

10. Plaintiff Amy Pierron is the mother of Sam and Abby Pierron. She is a resident of the defendant school district.

11. Plaintiff Jon Stonger is a junior at Olathe South High School. He attended Indian Trail Junior High School in the defendant school district during the 1993–94 academic year.

12. Plaintiff Rex Stonger is the father of Jon Stonger and is a resident of the defendant school district.

13. Defendant Unified School District No. 233, Johnson County, Kansas (the "Olathe School District" or the "District") is a duly organized school district of the State of Kansas. The District is a proper party pursuant to K.S.A. § 72–8201. The Olathe School District Board of Education (the "Board") is the governing body of the Olathe School District. The Board is composed of seven publicly elected members. At all relevant times to this action, the members of the Board were Frank Taylor (President), Robert Drummond (Vice President), Kevin Hammeke, Ronald Hinkle, Steven Hougland, Richard Marriott, and Janet Simpson.

14. The Olathe School District, through the Board of Education, is responsible for the operation of Olathe South High School, Olathe East High School, Olathe North High School, Indian Trail Junior High School, and Pioneer Trail Junior High School, as well as other schools within the District.

15. Defendant Dr. Ron Wimmer is the Superintendent of Schools for defendant Olathe School District. Dr. Wimmer is the chief executive officer of the District.

## B. The Removal of Annie on My Mind

16. During 1993, the Gay and Lesbian Alliance Against Defamation/Kansas City (GLAAD/KC) and Project 21 engaged in the promotion of so-called gay and lesbian issues in the Kansas City metropolitan area.

17. On March 15, 1993, Project 21 circulated questionnaires to Olathe School Board member candidates asking for their views on certain gay and lesbian issues. Project 21 also advised the candidates of its purposes and agenda.

18. In the summer of 1993, GLAAD/KC and Project 21 notified the Olathe School District's media specialists[2] that they were launching a book project to insure that students had access to diverse information regarding gender and sexual orientation.

19. On or about July 16, 1993, the Regional Coordinator of Project 21, Robert Birle, wrote Dr. Wimmer and requested the identity of the district representative to whom he could send curriculum materials and resource information concerning sexual orientation (including heterosexuality, bisexuality and homosexuality).

20. On or about August 9, 1993, Robert Birle, on behalf of GLAAD/KC and Project 21, wrote Dr. Wimmer and offered to donate two books with gay or lesbian story lines to the District. The books were Annie on My

---

1. Plaintiff Johanna Kamberg is in the seventh grade. She was in grade school at the time of the book removal. In a previous order, the court held that Johanna lacked standing because she did not have access to Annie on My Mind from the school library at the time of its removal. Case v. Unified Sch. Dist. No. 233, 895 F.Supp.

1463, 1468 (D.Kan.1995) (citing Roberts v. Madigan, 921 F.2d 1047, 1052 (10th Cir.1990)).

2. A "media specialist" within the Olathe School District is the equivalent of a librarian.

*Mind* by Nancy Garden and *All American Boys* by Frank Mosca.

21. *Annie on My Mind* is a novel depicting a fictional romantic relationship between two teenage girls. *Annie* has received numerous literary awards and distinctions, including an American Library Association award for "Best of the Best" books for young adults. The book contains no vulgarity, offensive language, or explicit sexual content.

22. In October 1993, Birle delivered copies of *Annie on My Mind* and *All American Boys* to each of the three Olathe School District high schools.

23. The Project 21 book donation to the Olathe School District and other local school districts received extensive media coverage in the Kansas City metropolitan area, and school district representatives received a number of telephone calls from the public, presumably prompted by the media coverage.

24. On October 6, 1993, Loretta Wood, the Olathe East High School media specialist, notified Dr. Alison Banikowski, the District's Assistant Superintendent for Curriculum and Instruction, that the District's online library catalog indicated that prior to the donation, the Olathe South High School library had two copies of *Annie on My Mind* on its shelves. School officials later discovered that copies of *Annie* also were located in the collections at Olathe East High School, Pioneer Trail Junior High School, and Indian Trail Junior High School, and had been on the library shelves of those schools prior to the book donations. Copies of *Annie* were not located in any other Olathe School District library. No copies of *All American Boys* were located in any of the District's libraries.

Trial testimony indicated that copies of *Annie* were on the District's library shelves for a number of years. Some of the copies had been on the shelves since the mid–1980s. The evidence does not show that anyone checked out or read the District's copies of *Annie* prior to the dispute involved in this case.

25. On October 8, 1993, Dr. Banikowski requested Loretta Wood and the other media specialists of the District to review the donated books and to advise her of their conclusions as to the suitability of the book for inclusion in the District's library collections.

26. The librarians examined and compiled national book reviews of *Annie on My Mind*. These generally were found to be favorable reviews of the book.

27. On or about October 25, 1993, Jeffrey Blair, a media specialist at Olathe South High School, sent a memorandum to Loretta Wood advising that he had reviewed both of the donated books. Blair found *Annie on My Mind* to be of value, but not *All American Boys*. He described the characters in *Annie* as "fully rounded and believable." Blair was concerned about the lack of reference to communicable diseases and AIDS in either book. He pointed out that *Annie* was currently on the shelves at Olathe South. Blair recommended that the school keep *Annie* on the shelf, but that the school should not add *All American Boys* to the collection. The latter book had not been a part of the district's collection.

28. Loretta Wood then wrote a memorandum to Dr. Banikowski in which she gave *Annie on My Mind* a favorable review. Wood found the book "sensitive and realistic." In contrast, Wood described *All American Boys* as "shallow and incomplete."

29. Media coverage continued regarding the Project 21 book donations. The *Kansas City Star* reported that protesters burned copies of *Annie on My Mind* on the steps of the Kansas City School District offices. The article also reported that copies of *Annie on My Mind* had been on the shelves of the Olathe South High School since the mid–1980s.

30. On or about October 26, 1993, Dr. Banikowski reported to Dr. Wimmer that the continuing media coverage had prompted her to organize a meeting on November 1, 1993 with all media specialists to discuss and review the donated books.

31. On November 1, 1993, Dr. Banikowski and Dr. Patricia All, the Executive Director of Education and Technology for the Olathe School District, met with the District's secondary media specialists (high school librari-

ans) to discuss the results of their review of the donated books. All media specialists agreed that *Annie on My Mind* was an appropriate book for the high school library collections, but that *All American Boys* was not appropriate. The media specialists were in agreement that *Annie* had literary merit and that other reviews were quite favorable.

32. Dr. Banikowski advised Dr. Wimmer of the outcome of the media specialists' review. She indicated that she would return the copies of *All American Boys.*

33. On November 9, 1993, Dr. Banikowski wrote Robert Birle and advised him that the District had accepted the donation of *Annie on My Mind*, but had not accepted *All American Boys.*

34. On November 11, 1993, Dr. Wimmer informed Board of Education members Janet Simpson and Ron Hinkle that the District had received copies of the two books from Project 21, that the District had initiated its book review procedures, and that the library review committee had recommended acceptance of *Annie on My Mind* and rejection of *All American Boys.* Dr. Wimmer also stated that he had not received any formal complaints from parents regarding the books. Dr. Wimmer provided a copy of *Annie on My Mind* to Board members Simpson and Hinkle so that they could read the book.

35. Dr. Wimmer met with Dr. Banikowski and Dr. All and determined that the District needed to clarify procedures on donated books. Dr. Wimmer also wanted to discuss the public concern regarding the donated books.

36. On December 10, 1993, Dr. Wimmer indicated in a memorandum called "board notes" sent to Board of Education members that he had scheduled a meeting with the media specialists in order to make a "final disposition" of the book donation issue.

37. During the weekend prior to the meeting with the District's media specialists, Dr. Wimmer prepared a set of "Book Donation Guidelines." Dr. Wimmer did not seek input from anyone in the preparation of these guidelines.

38. Dr. Wimmer and Dr. Banikowski met with the secondary media specialists on December 13, 1993, and at the meeting Dr. Wimmer disseminated his new book donation guidelines. Dr. Wimmer had decided prior to this meeting that the District would not only refuse the books donated by Project 21, but that existing copies of *Annie on My Mind* would be removed from the District's libraries. Dr. Wimmer did not have any meetings or consultations with the District's media specialists prior to making his decision to remove *Annie on My Mind* from the District's libraries.

39. Following his explication of the new book donation guidelines, Dr. Wimmer informed the media specialists that *Annie on My Mind* was to be removed from the District libraries. Dr. Banikowski asked the media specialists to send all copies of *Annie* to her office.

40. Although the District had not received written complaints from anyone about *Annie on My Mind*, Dr. Wimmer told the media specialists that the District needed to take action because of community concerns regarding the issue. Dr. Banikowski and the District office had received numerous phone calls protesting the fact that *Annie on My Mind* was on the library shelves.

41. Dr. Wimmer also advised the media specialists that he did not believe that the Board of Education would support acceptance of the book donation. Based upon his experience in working with the Board members, Dr. Wimmer felt that a majority of the Board "would favor taking this book off the shelves."

42. Dr. Wimmer testified that "[t]he book in and of itself was not—nor the content of the book was not a high criteria in regard to my decision. It was all of the issues that were related and surrounding to that." Dr. Wimmer further explained that those issues were:

Project 21 and the turmoil that primarily ... was created in the media and the constant distraction that we were encountering in terms of trying to focus on what we really were all about at the time. I was trying to make a determination that would try to put that into some frame of refer-

ence, and de-emphasize the focus that was being placed on that issue.

43. Dr. Wimmer removed the book from District libraries in part because he believed Project 21 was using the book to promote the group's agenda—introduction of information about homosexuality into the curriculum—which was creating controversy. Dr. Wimmer concluded that removing the book would keep the District from being "embroiled into this situation" and would not be adverse to the interests of students because, in his perception, the book did not appear to have been used.

44. There was no discussion in Dr. Wimmer's meeting with the media specialists about the literary merit or educational suitability of *Annie on My Mind*. Neither did they discuss whether the subject matter of *Annie on My Mind* was appropriate for high school or junior high students. Dr. Wimmer and the media specialists did not discuss alternatives to removal of the book, such as placement on a restricted shelf.

45. Following the meeting with Dr. Wimmer, the Olathe School District media specialists removed all existing copies of *Annie on My Mind* from the District's library shelves.

46. On December 16, 1993, Dr. Wimmer distributed the new book donation guidelines to the District's principals and media specialists. Dr. Wimmer felt the guidelines would assist administrators in handling difficult situations.

47. On or about January 4, 1994, plaintiff Amanda Greb and other District students asked permission to speak at the January 6, 1994 school board meeting to express their views regarding the removal of *Annie on My Mind* from the District's libraries. The students' names were placed on the Board agenda. The Board met in regular session on January 6, 1994. During the meeting, several individuals, including plaintiffs Amanda Greb, Stevana Case, and Sam Pierron, addressed the Board on whether *Annie on My Mind* should be removed from the District libraries. Presentations were made both for and against removal of the book. Everyone

who indicated a desire to speak on the issue was permitted to address the Board.

48. Prior to the January 6, 1994 Board of Education meeting, Dr. Wimmer advised the Board that they should not respond publicly to comments made at the meeting. Dr. Wimmer also recommended that if the Board wished to take a position on the book removal issue, the Board should adjourn to executive session prior to a vote to consult with their attorney. Following the presentations, the Board adjourned to an executive session to consult with counsel and remained in executive session for thirty minutes. During the executive session, the Board heard presentations from Dr. Wimmer and the Board's counsel regarding the issues surrounding the removal decision. At no time did the Board discuss the literary merit or educational suitability of *Annie on My Mind*.

49. Prior to the board meeting, Dr. Wimmer had provided the Board with a packet of materials that included a December 30, 1993 letter from the Olathe School District's counsel. The letter advised the Board about First Amendment issues associated with the removal of a book from school libraries. In the letter, the District's counsel advised the Board that a local school board must exercise its discretion "in a manner that complies with the First Amendment." Counsel also stated that "the special characteristics of the school library make that environment especially appropriate for the recognition of the First Amendment rights of Students." Counsel suggested that "if the decisive factor for the removal decision was the 'educational suitability' of the book in question, then its removal would be permissible." The term "education suitability" had not appeared in any of defendants' documents or discussions prior to counsel's letter.

50. After the Board returned to open session from its executive session, Board member Hinkle moved to support Dr. Wimmer's decision to remove *Annie on My Mind* from the district's school libraries. Board member Marriott seconded the motion. Without further discussion the Board voted four to two in favor of the motion. Board members Dr. Robert Drummond, Ronald Hinkle, Richard Marriott, and Janet Simpson voted to

remove the book. Board members Kevin Hammeke and Steven Hougland opposed the removal. Board member Frank Taylor was not present at the meeting and did not vote on the book removal. As previously noted, the Board members did not engage in any public discussion of their views regarding the book removal and did not address any of the comments the public had made prior to the Board's vote on the issue.

51. On January 11, 1994, Dr. Wimmer met with students, including plaintiffs Amanda Greb and Sam Pierron, at Olathe South High School to discuss the decision to remove *Annie* from school libraries in the District. Dr. Wimmer told the students that the book had been removed not because a special interest group had donated it, but because leaving the book on the shelf would keep the School District embroiled in controversy.

## C. Motivation for the Removal

52. Board Member Richard Marriott testified that he voted to remove *Annie on My Mind* because he felt the content of the book was very shallow and very offensive. He was offended by the book's "glorification of the gay lifestyle." He believed that in order for the book not to glorify that lifestyle, "the entire theme would have to be changed." Marriott agreed with the following comments made in a letter written to him:

> There is absolutely no confirmation in the scientific world that homosexuality is a normal or genetic way of life. Therefore, there is absolutely no reason to pass the information to our teens in support of these claims. I do not believe that homosexuality is a normal way of life; I believe it is a choice. Unfortunately, I also believe that it is a choice that destroys healthy sexuality, self image, and obviously leads to a [sic] onslaught of physical destruction.

Marriott testified that if the Board allowed the book to remain on the shelf, the community would have looked upon that as the Board of Education's endorsement or approval of a homosexual lifestyle.

53. Board member Robert Drummond testified that he voted to remove *Annie on My Mind* because he felt that the book was inappropriate and unsuitable for students because it "glorifies and promotes" homosexuality. Drummond testified, "I think part of the theme running through the book, as I recall, is continual tacit endorsement of that particular lifestyle, that it's okay, that it's something that is very acceptable and very typical, very, again, okay." Drummond believed that *Annie on My Mind* "promotes homosexuality." He testified that homosexuality is a mental disorder, immoral, and contrary to the teachings of the Bible and the Christian church. He further stated that homosexuality is a mental disorder similar to schizophrenia or depression. Drummond voted to remove *Annie on My Mind* because he believed the book glorified a lifestyle that is sinful in the eyes of God.

54. Board member Ronald Hinkle testified that he voted to remove *Annie on My Mind* because he did not think the book was educationally significant or suitable for students. Hinkle testified that he believed that the book had little or no value and that it was not particularly well written. In Hinkle's view, the "book did not seem to give a realistic treatment of the subject matter, and that relates back to promotion and glorification." Hinkle felt the book was not realistic "[b]ecause it didn't deal with some of the practicalities that homosexuals have to deal with and face. Again, in reference to potential disease, potential death (sic). It just didn't even address those issues, let alone broken relationships with family, friends, et cetera."

When asked why he thought the book was not well written, Hinkle responded: "I'm not defining 'well written' in the sense that the English language is abused at all. There's proper sentence structure and all of that, so in that sense, I'm not saying the book is not well-written. I'm saying the particular theme and the purpose of the book was, I thought, very shallow. I thought it was very shallow." Hinkle believed that the book was shallow because: "There's not a whole lot of in-depth thought or consideration about the particular subject matter. It seemed to have one goal ... [t]o say that it's okay to be gay, don't worry about it. That seemed to be thrust. And in that sense, I didn't think the book was well written."

Hinkle testified that it is not "okay" to be gay, "[b]ecause engaging in a gay lifestyle can lead to death, destruction, disease, emotional problems." Hinkle concluded that one of the basic reasons he did not think the book was educationally suitable was because it promoted or glorified the homosexual lifestyle, which "does not meet the basic moral standards of the community." Hinkle believes that in his community, one must be heterosexual in order to meet community moral standards. Hinkle also voted to remove the book because he believed that if the book had been left on the shelf, the public would perceive that as the school board's endorsement or advocation of a homosexual lifestyle.

55. Board member Janet Simpson testified that she voted to remove *Annie On My Mind* from the District's libraries because she believed that schools should stay completely away from the subject of homosexuality. Simpson concluded that the book was well written, but was objectionable because "it was promoting a very unhealthy lifestyle."

Simpson found the book educationally unsuitable because "it glorified homosexuality as a lifestyle." Simpson stated that she believes homosexuality is unnatural. Simpson testified that the only books about homosexuality she would find educationally suitable are those that would instruct that homosexuality is unhealthy and that would contain "statistics and actual case studies of the results of homosexuality on the mental, physical, emotional, and social well-being of adolescents from entering adolescence to adulthood." She stated that she believes the library should contain only factual books,[3] which would not include *Annie* or other works of fiction, but would include the Bible because she believes that everything in the Bible is factual.

Simpson believed she had a mandate from patrons in the District to remove the book because it conflicted with the District's values, which are "traditional family values." Simpson testified that she believes in the Bible, and what the Bible says about homo-

sexuality and creationism in the book of Genesis.

56. Board member Steve Hougland testified that he voted against the removal of *Annie On My Mind* on freedom of speech grounds.

57. Board member Kevin Hammeke testified that he voted against removal of *Annie* from the District libraries because he believed it was a First Amendment issue.

### D. The District's Policies and Procedures

58. The Olathe School District libraries use a computer catalog system. The school libraries allow books to be loaned to other libraries within the district.

59. Only students and faculty may check out materials from the school libraries. A student must be enrolled in a school to check out books from that school's library. Students in the District may check out books from other libraries in the District through an inter-library loan system.

60. The Olathe School District hosts a "Media Center Night" no more frequently than one night per week. At Media Center Night, students and their parents may use the high school libraries on a limited basis. The primary purpose of Media Center Night is to allow current students to perform research, write papers, and meet with teachers.

61. The Olathe School District has adopted a written "Media Selection Policy," which is included in the District's procedures manual. Dr. Wimmer and his staff developed and adopted the media selection policy pursuant to the Board's delegation of authority to Dr. Wimmer to create and adopt administrative procedures. The media selection policy sets forth the District's selection criteria for library resources. The policy incorporates the American Library Association's School Library Bill of Rights, which states that it is the responsibility of the school library media center to provide materials that: support the curriculum; encourage students' "growth in knowledge" and

---

**3.** Her educational views appear to comport with those of Thomas Gradgrind in *Hard Times*, by Charles Dickens.

"development of literary, cultural and aesthetic appreciation and ethical standards"; and "reflect the ideas and beliefs of religious, social, political, historical, and ethnic groups and their contribution to the American and world heritage and culture, thereby enabling students to develop an intellectual integrity in forming judgment." Dr. Wimmer agrees with the policy and believes it should be followed. Historically, the District has followed this policy in addressing complaints or concerns regarding library materials.

62. The media selection policy also contains procedures for the reconsideration of challenged media. This policy is now and was in effect at all relevant times. The media selection policy sets out a 13-step written procedure to address concerns about library materials. The process begins when a patron challenges the appropriateness of the materials and notifies a teacher, media specialist, or principal. If the building principal is unable to resolve the complaint informally without the removal of the item, the complaint is referred to the appropriate library media coordinator, who appoints a committee to review the complaint. The committee is charged with reading the challenged material and evaluating it according to the District's established criteria for the selection of library materials. The committee issues a report, which is furnished to the building principal, who is responsible for implementing the committee's decision. The complainant is notified of the District's disposition of the complaint. If dissatisfied, the complainant may appeal to the superintendent.

63. The District failed to follow its adopted procedures for the reconsideration of library materials. The District neither awaited a formal complaint, nor appointed a committee to consider the removal (as opposed to the donation) of *Annie on My Mind*. If the media specialists committee that was established to consider the donations also acted as a review committee for materials already on the shelves, its recommendation was ignored. The District's written guidelines forbid a reversal of the Review Committee's decision without an appeal to the superintendent by a complainant. No

appeal was made. The District also ignored its own incorporation of the American Library Association's Library Bill of Rights, which affirms the importance of having a diversity of ideas available in the library "thereby enabling students to develop an intellectual integrity in forming judgment."

64. After the media specialists had concluded that the donation of *Annie on My Mind* should be accepted and that the books should be added to the existing copies on the shelves, Dr. Wimmer overrode that decision by promulgating new "book donation guidelines." Dr. Wimmer used the new book donation guidelines to rationalize the refusal of the donation and to remove existing copies of *Annie on My Mind* from the shelves, even though his newly-devised donation policy did not cover the removal action. In doing so, he disregarded the recommendation of the media specialists as well as the District's established criteria for the reevaluation of library resources.

65. In voting to affirm Dr. Wimmer's decision and remove *Annie on My Mind*, the Board of Education did not follow the reconsideration policy, which requires that challenged materials be evaluated according to the District's established criteria for the selection of library materials. There was no discussion by the Board concerning the literary or educational merit of the book. The Board of Education ignored its own guidelines and criteria established for the reconsideration of library materials.

## III. Conclusions of Law

### A. Standing and Mootness

Defendants contend that plaintiffs lack standing to challenge the removal of *Annie on My Mind*. Defendants argue that the claims of several plaintiffs are now moot or that plaintiffs have not suffered an injury-in-fact because *Annie* is available at the public libraries.

The federal courts are courts of limited jurisdiction. Article III of the United States Constitution requires federal courts to consider only actual "cases or controversies." The court must determine whether the parties satisfy the Article III "case or controver-

sy" requirements at each stage of litigation. *See Schanou v. Lancaster County Sch. Dist.*, 62 F.3d 1040, 1042 (8th Cir.1995). "Courts employ a number of doctrines to determine justiciability such as standing, ripeness, and mootness." *Id.* A district court should not avoid the threshold issue of standing and address the constitutional issues in a case. "It is a long-standing practice in our jurisprudence to avoid constitutional questions when they are unnecessary to the disposition of a case." *Id.* at 1042 n. 1.

■ Three elements are involved in constitutional standing requirements:

First, the plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged conduct of the defendant, and not the result of independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 1044 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal brackets, quotation marks, and citations omitted)).

■ This court has previously determined that current and former students, parents of those students, and a teacher had standing to challenge the removal of *Annie on My Mind*. Student plaintiffs presented evidence at the summary judgment stage that they maintained access to the library during Media Center Night even after graduation. Thus, the court concluded that these plaintiffs' injuries would be redressed because their access to the book would be restored if the court granted the requested injunctive relief. After hearing evidence at trial about the actual access of former students and the public during Media Center Night, the court now concludes that the claims of former students and their parents are moot.

Former students and the public are not allowed free access to the Olathe School District's libraries during Media Center Night. The purpose of Media Center Night is to allow current students an additional opportunity to use the library facilities to complete projects, conduct research, and meet with teachers. Former students are not allowed to check out books at Media Center Night. The mootness problem is not overcome by the District's practice of allowing former students to visit the school libraries one night per week. Former students no longer have a cognizable interest in the case or controversy and their injuries would not be redressed by the return of the book to the libraries. *See Schanou*, 62 F.3d at 1043 (request for injunctive relief no longer presents a live controversy because student had graduated); *Roberts v. Madigan*, 921 F.2d 1047, 1052 (10th Cir.1990), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992) (injunctive relief could not redress plaintiff's injury because plaintiff was no longer in the classroom from which the books were removed).

Accordingly, the court concludes that the claims of the former students Stevana Case, Amanda Greb, Rebekka Kamberg, and Sam Pierron must be dismissed. The claims of the parents on behalf of the former students also must be dismissed. Thus, the claims of Steven Case on behalf of Stevana Case, Cynthia Greb on behalf of Amanda Greb, Mary-Lane Kamberg on behalf of Rebekka Kamberg, and Amy Pierron on behalf of Sam Pierron are dismissed.

■ At the summary judgment stage of the case the court also determined that plaintiff Johanna Kamberg lacked standing because she was in grade school at the time of the defendants' removal of *Annie on My Mind* and she did not have access to the book from the school library. *Case v. Unified Sch. Dist. No. 233*, 895 F.Supp. 1463, 1468 (D.Kan.1995) (citing *Roberts*, 921 F.2d at 1052). Plaintiffs presented evidence at trial that plaintiff Abby Pierron is currently in the eighth grade and attends Frontier Trail Junior High School. According to the court's calculations, Abby was in the sixth grade at the time of the book removal. There is no evidence which indicates that this

assumption is incorrect. The court concludes that plaintiff Abby Pierron has failed to establish "an injury in fact" because she also did not have access to the book at the time of its removal. *See Roberts*, 921 F.2d at 1052 (students lacked standing to challenge removal of books to which they did not have access). Thus, Abby Pierron lacks standing for the same reasons that Johanna Kamberg lacks standing. Plaintiff Abby Pierron's claims must be dismissed for lack of standing along with the claims of Amy Pierron on behalf of Abby Pierron.

■ Next, the court must evaluate the claims of parents in their individual capacity. In the court's opinion, the parents' standing is dependent upon their children's standing. The constitutional right to challenge the removal of a book from a school library appears to be held by the student who is denied access to the book. Plaintiffs have not presented any evidence that the removal of *Annie on My Mind* abridged the individual constitutional rights of parents. Thus, all individual capacity claims of parents Steven Case, Cynthia Greb, Mary–Lane Kamberg, Amy Pierron, and Rex Stonger are dismissed.

The remaining plaintiffs are current Olathe School District students Andy Case and Jon Stonger and their parents Steven Case and Rex Stonger. Plaintiff Steven Case also claims standing in his capacity as an Olathe School District teacher. After carefully evaluating the standing of the remaining plaintiffs, the court concludes that these current students and their parents have standing to challenge the removal of *Annie on My Mind.*

Andy Case and Jon Stonger had access to *Annie* at the time of its removal from their respective high school or junior high libraries either because the book actually was present on the shelves or because it was available through inter-library loan. Injunctive and declaratory relief would redress the injury because their access to the book from the school library would be restored.

In addition, Steven Case, in his capacity as a teacher, has standing to challenge the book removal. Steven Case had access to the school library before the removal of *Annie on My Mind* for his personal and profession-

al use. He had the ability to check out books and to assign readings to his students. The court concludes that Steven Case has standing as a teacher to challenge the book's removal. *See Salvail v. Nashua Bd. of Educ.*, 469 F.Supp. 1269 (D.N.H.1979) (faculty subclass was proper plaintiff); *Right to Read Defense Comm. v. School Comm.*, 454 F.Supp. 703 (D.Mass.1978) (plaintiffs included librarian and teacher).

Having resolved the standing issues, the court now must address the claims of plaintiffs that defendants' removal of *Annie on My Mind* from the District's libraries violated plaintiffs' rights under the First and Fourteenth Amendments.

### B. First Amendment Claim

■ Although local school boards have broad discretion in the management of school affairs, they must act within fundamental constitutional limits. *See Board of Educ. v. Pico*, 457 U.S. 853, 863–65, 102 S.Ct. 2799, 2806–07, 73 L.Ed.2d 435 (1982) (citing *Meyer v. Nebraska*, 262 U.S. 390, 402, 43 S.Ct. 625, 627–28, 67 L.Ed. 1042 (1923) and *Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969)). In *Pico*, the United States Supreme Court addressed the very issue that confronts the court in the present case: Does the First Amendment impose any limitations upon the discretion of school officials to remove library books from high school and junior high libraries? In a plurality opinion, the Court concluded there are limits. *Id.* at 871–72, 102 S.Ct. at 2810.

The *Pico* plaintiffs challenged the school board's removal of nine books from the school's libraries. A majority of the Court agreed that genuine issues of material fact precluded summary judgment in favor of the school board. *Id.* at 875–76, 883, 102 S.Ct. at 2812, 2816. Writing for the plurality, Justice Brennan opined that the motivations of school officials would be unconstitutional if the school officials "intended by their removal decision to deny respondents access to ideas with which [the officials] disagreed, and if this intent was the decisive factor in [the removal] decision." *Id.* at 871, 102 S.Ct. at

2810. The plurality went on to hold that "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872, 102 S.Ct. at 2810 (quoting *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943)). The *Pico* plurality indicated that removal may be permissible if the book contained "pervasive vulgarity" or if the book was "educationally unsuitable." *Id.*

Writing separately, Justice Blackmun disagreed with the plurality's assertion that school children have a "right to receive information." *Id.* at 875–79, 102 S.Ct. at 2812–14 (concurring opinion). Instead, he focused on the school board's denial of access to ideas. Justice Blackmun would hold that "school officials may not remove books for the purpose of restricting access to the political ideas or social perspectives discussed in them, when the action is motivated simply by the officials' disapproval of the ideas involved." *Id.* at 879–80, 102 S.Ct. at 2814 (concurring opinion).

The plurality decision in *Pico* is not binding precedent. *United States v. Friedman,* 528 F.2d 784 (10th Cir.1976), *judgment vacated on other grounds,* 430 U.S. 925, 97 S.Ct. 1541, 51 L.Ed.2d 769 (1977); *Campbell v. St. Tammany Parish Sch. Bd.,* 64 F.3d 184, 189 (5th Cir.1995). The court notes, however, that this is the only Supreme Court decision dealing specifically with the removal of books from a public school library. The court also notes that there are no Tenth Circuit Court of Appeals decisions directly on point. Thus, the court concludes that it should follow the *Pico* decision in analyzing the Olathe School District's removal of *Annie on My Mind* from the District's libraries. *Case v. Unified Sch. Dist. No. 233,* 895 F.Supp. 1463, 1469 (D.Kan.1995); *see Campbell,* 64 F.3d at 189.

In a recent Fifth Circuit decision, the court reversed the district court's grant of summary judgment in favor of plaintiffs who challenged the school board's removal of a book from the school library. *Campbell,* 64 F.3d at 191. The Fifth Circuit agreed that *Pico* should guide its book removal analysis. The court of appeals remanded the case for trial and directed the district court to determine the "actual motivation" behind the school board's removal of the book, *Voodoo & Hoodoo. Id.* The court made the following observation in the path to its decision to remand:

[I]n light of the special role of the school library as a place where students may freely and voluntarily explore diverse topics, the School Board's non-curricular decision to remove a book well after it had been placed in the public school libraries evokes the question whether that action might not be an unconstitutional attempt to "strangle the free mind at its source."

*Id.* at 190 (quoting *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943)). The court also noted that the school board's failure to follow its own procedures raised suspicion that the motivation of the school board was unconstitutional. *Id.* at 190–91.

In the present case, the court must determine the "actual motivation" of the school board members in their removal decision. If the decisive factor behind the removal of *Annie on My Mind* was the school board members' personal disapproval of the ideas contained in the book, then under *Pico* the removal was unconstitutional.

The Board of Education members who voted in favor of the removal of *Annie on My Mind* stated that they believed the book was "educationally unsuitable." The court is required to assess the "credibility of [school officials'] justifications for their decision." *Pico,* 457 U.S. at 875, 102 S.Ct. at 2812.

There is no basis in the record to believe that these Board members meant by "educational suitability" anything other than their own disagreement with the ideas expressed in the book. Here, the invocation of "educational suitability" does nothing to counterbalance the overwhelming evidence of viewpoint discrimination.

Accordingly, the court concludes that defendants removed *Annie on My Mind* because they disagreed with ideas expressed in

the book and that this factor was the substantial motivation in their removal decision. Through their removal of the book, defendants intended to deny students in the Olathe School District access to those ideas. Defendants unconstitutionally sought to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872, 102 S.Ct. at 2810; *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1942).

The highly irregular and erratic manner in which defendants removed *Annie on My Mind* from the District's libraries and their disregard of established policy and procedure are important evidence of their improper motivation. *See Pico*, 457 U.S. at 874–75, 102 S.Ct. at 2812; *Campbell*, 64 F.3d at 190–91. In addition, defendants did not consider or discuss less restrictive alternatives to complete removal of the book. This is also persuasive evidence of improper motivation. *See Campbell*, 64 F.3d at 190.

Defendants have argued that they have broad discretion to transmit community values, and that they may remove library books based upon their personal social, political, and moral views. The Supreme Court in *Pico* expressly rejected this argument, noting that "petitioners' reliance upon that duty [to transmit community values through curriculum] is misplaced where, as here, they attempt to extend their claim of absolute discretion beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there hold sway." *Pico*, 457 U.S. at 869, 102 S.Ct. at 2809.

■ Defendants also have argued that plaintiffs' have not been denied access to the book because it is available from sources outside of the school library. The availability of *Annie on My Mind* from other sources does not cure defendants' improper motivation for removing the book. "Restraint on expression may not generally be justified by the fact that there may be other times, places, or circumstances available for such expression." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir.1976)

(removal of books because school board found them distasteful was unconstitutional).

In accordance with the analysis in *Pico* and *Campbell*, the court concludes that defendants' removal of *Annie on My Mind* from the Olathe School District libraries was a violation of plaintiffs' First Amendment rights. In addition, the Kansas Constitution, Bill of Rights § 11 entitles plaintiffs to prevail on their free speech claim to the same extent that they have prevailed on their First Amendment claim under the United States Constitution. *See Unified Sch. Dist. No. 503 v. McKinney*, 236 Kan. 224, 234–35, 689 P.2d 860 (1984) (using United States Supreme Court decisions as persuasive authority in state free speech analysis); *State v. Russell*, 227 Kan. 897, 899, 610 P.2d 1122, *cert. denied*, 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980) (federal and state free speech provisions generally considered coextensive).

## C. Due Process Claim

■ The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of life, liberty or property, without due process of law...." U.S. Const. amend 14, § 1. Plaintiffs seek to establish that their due process rights were violated by the Olathe School District's failure to follow its own procedures. Although the court finds the District's failure to observe its own removal rules as evidence of an improper motive, the court does not agree that the failure to follow these procedures creates a constitutional due process violation. *See Bicknell v. Vergennes Union High Sch. Bd. of Directors*, 638 F.2d 438, 442 (2d Cir. 1980) (decided the same day as the Second Circuit's decision in *Pico v. Board of Educ.*, 638 F.2d 404 (2d Cir.1980), *aff'd*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982)).

The court is not convinced that plaintiffs have a liberty or property interest in the removal of a book from the school library. *See id.* (deprivation resulting from the removal of a book from the school library is not a particularized and personal interest that would entitle student or librarian to a hearing prior to removal). With regard to procedural due process, defendants provided an opportunity for members of the public and

plaintiffs to express their views at the January 1994 school board meeting. The public board meeting satisfied the minimum federal constitutional requirements. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985). The court concludes that defendants' removal of *Annie on My Mind* did not violate plaintiffs' due process rights under the Fourteenth Amendment.

### D. Conclusion

For the foregoing reasons, the court concludes that defendants' removal of *Annie on My Mind* from the Olathe School District libraries violated plaintiffs' constitutional rights under the First Amendment of the United States Constitution and under the Constitution of the State of Kansas, Bill of Rights, § 11. Further, the court concludes that defendants did not violate plaintiffs' due process rights under the Fourteenth Amendment.

The court orders defendants to return the copies of *Annie on My Mind* to the libraries in the Olathe School District where they were located prior to the removal. This is to be accomplished on or before January 2, 1996. The court further orders that the books be made available according to the usual terms and conditions prescribed for the use of library materials in the District.

Pursuant to 28 U.S.C. § 1988, plaintiffs are entitled to an award of attorneys fees, costs, and expenses associated with the prosecution of this case. Counsel are ordered to confer and attempt to reach an agreement regarding the fee award. *See* D.Kan.Rule 54.2.

IT IS, THEREFORE, BY THE COURT ORDERED that plaintiffs' request for injunctive and declaratory relief is granted. The Clerk of the Court shall enter judgment in favor of the remaining plaintiffs in accordance with the findings and conclusions contained in this memorandum and order.

IT IS FURTHER ORDERED that plaintiffs Stevana Case, Amanda Greb, Cynthia Greb, Rebekka Kamberg, Johanna Kamberg, Mary–Lane Kamberg, Sam Pierron, Abby Pierron, and Amy Pierron are dismissed from the case because they lack standing.

IT IS FURTHER ORDERED that defendants' motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50 (Doc. 183) is denied.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**