Enrique PONCE, Jr. and Rocio Ponce, Individually and as next friends of E.P. a minor child, Plaintiffs,

v.

SOCORRO INDEPENDENT SCHOOL DISTRICT, Defendant.

No. EP–06–CA–00039–KC.

United States District Court, W.D. Texas, El Paso Division.

May 2, 2006.

---

Stephen Gordon Peters, El Paso, TX, for Plaintiffs.

Henry C. Hosford, Larry A. Baskind, Baskind, Samaniego & Hosford, P.C., El Paso, TX, for Defendant.

### ORDER

CARDONE, District Judge.

On this day, the Court considered "Plaintiffs' Motion for Preliminary Injunction" ("Pls.'s Mot.") and "Defendant's Motion to Dismiss Pursuant to Rule 12b or Alternatively for Summary Judgment" ("Def.'s Mot."). For the reasons set forth below, Plaintiffs' Motion is **GRANTED**

and Defendant's Motion is **DENIED**, in part, and **GRANTED**, in part.

## I. BACKGROUND

This case involves a student's challenge to disciplinary action imposed upon him by the Socorro Independent School District (SISD) ("Defendant") for the content of his writing.

While enrolled as a sophomore in Montwood High School, a minor student identified as E.P. wrote in a green spiral notebook. Def.'s Mot. 2; Def.'s Mot. Ex. 1 para. 5–6 ("Aguirre Aff."); Pls.'s Resp. in Opp. to Def.'s Mot. to Dismiss or Alternatively for Summ. J. ("Pls.'s Resp."), Aff. of E.P. III para 1–4 ("E.P.Aff."). He wrote the notebook in the form of a diary, from a first-person point of view, detailing the "author's" creation of a pseudo-Nazi group on the Montwood High School campus. Aguirre Aff. para 4–6; E.P. Aff. para 2. The notebook describes several incidents involving the pseudo-Nazi group, many including the use or threatened use of violence, and eventually culminates with the group's plan to commit an attack on Montwood High School in the "author's" senior year of school. Aguirre Aff. para 8; E.P. Aff. para 5, 9–16.

On August 15, 2005, E.P. told another student ("informing student") about the notebook and showed him some of its contents. Def.'s Mot. 2; E.P. Aff. para 5. The informing student told a teacher about the notebook.[1] Def.'s Mot. 2; Aguirre Aff.

---

1. The parties dispute the manner in which E.P. told the informing student about the notebook. E.P. claims that he told the informing student that he was writing a fictional story, and then proceeded to show the informing student the notebook. E.P. Aff. para 5. Aguirre, on the other hand, claims that E.P. told the informing student that he was actually a member of the Nazi party with storm troopers and weapons at his disposal, and that he was considering an attack on Montwood High School. Aguirre Aff. para 4.

At oral argument and in his response to Defendant's Motion, Plaintiffs objected to the admission of Aguirre's statements above to prove the truth of the matter asserted, but did not object to their admission to show their effect on the hearer. Defendant claims that the statements are not hearsay under Federal Rule of Evidence 803(1), (2), and (3). However, Defendant fails to provide any explanation or analysis of these Rules and their application to the relevant statements. Indeed, Defendant's entire re-

para 4. After waiting a day, the teacher then told Assistant Principal Jesus Aguirre ("Aguirre") about the notebook. Def.'s Mot. 2. Aguirre called the informing student into his office and questioned the informing student about his August 15th conversation with E.P. Aguirre Aff. para 4. Defendant does not provide any evidence as to the substance of said questioning, nor does it provide any admissible evidence regarding the informing student's statements to Aguirre. Thereafter, and presumptively as a result of this questioning, Aguirre decided to call E.P. into his office for a meeting. Aguirre Aff. para 5; E.P. Aff. para 6.

During this meeting, Aguirre told E.P. that students had complained to him about E.P. writing threats. E.P. Aff. para 6. E.P. denied these accusations, and instead explained that he was writing a work of fiction. Aguirre Aff. para 5; E.P. Aff. para 6. At some point, Aguirre asked E.P. for permission to search his backpack, and E.P. consented.[2] Aguirre Aff. para 5; E.P. Aff. para 6. It is at this point that Aguirre discovered the notebook in question. Aguirre Aff. para 5; E.P. Aff. para 6.

On the inside cover of the notebook, Aguirre observed the title "My Nazi Diary Based on a True Story." Aguirre Aff. para 6; E.P. Aff. para 6. When questioned, E.P. professed that the notebook was a work of fiction, and that the words "True Story" referred to *The Life & Death of Adolf Hitler* by Robert Payne—a book E.P. was in the process of reading. Aguirre Aff. para 6; E.P. Aff. para 6. In his affidavit, E.P. explained that he became interested in World War II because his grandfather fought in the U.S. Army during World War II, and that before reading Payne's book, he read *June 6, 1944: D–Day These Men Were There.* E.P. Aff. para 3.

Aguirre reviewed the contents of the notebook. Aguirre Aff. para 6. He continued to ask E.P. about specific "journal entries," to which E.P. continued to respond "It's all fiction." *Id.* Shortly thereafter, Aguirre called E.P.'s mother and requested that she meet him at the Montwood High School campus. *Id.* at para 7. She agreed to do so. *Id.*

Upon informing her of the notebook, E.P.'s mother told Aguirre that it was all fiction and noted that she, herself, engaged in creative writing. Aguirre Aff. para 7. In fact, E.P. claims that he got the idea to write a fictional journal from his mother because she had been taking creative writing courses at the University of Texas at El Paso, and had further suggested that he write a dramatic monologue—a story told from the point of view of one of its characters. E.P. Aff. para 2. Aguirre informed E.P.'s mother that he would read the notebook in detail and "call her the

---

ply to Plaintiff's objection consists of the following line: "Pursuant to Federal Rule of Evidence 803(1) through (3), statements told to Aguirre by a teacher and/or informing student that Aguirre acted upon are hearsay exceptions." Def.'s Reply to Pls.'s Resp. to Def.'s Mot. To Dismiss 1. This Court will not undertake Defendant's obligation to identify, explain, and apply legal authority to facts. Accordingly, to the extent Aguirre's statements regarding the manner in which E.P. told the informing student of the notebook are offered to prove the truth of the matter asserted, Plaintiff's objection is sustained.

2. When explaining his reasons for consenting to the search of his backpack, E.P. explained in his affidavit that, "I did not think I had done anything wrong, and I did not think I could say no, so I agreed." E.P. Aff. para 6. E.P. also explained that, while he gave Aguirre permission to search his bag, he never gave Aguirre permission to read his notebook, take it away, or show it to anyone. *Id.* para 7.

next day with an administrative decision based on the safety and security of the student body." Aguirre Aff. para 7. Following the conclusion of this meeting, Aguirre released E.P. back into the general student population to complete the school day. *Id.*

Aguirre then took the notebook home and read it several times. *Id.* at para 8. He stated that several lines in the notebook alarmed him.[3] *Id.* Aguirre then "determined that in the interest of safety and security to the students and campus that the writing by E.P. was threatening and a danger to students. [He] viewed it to be a terroristic threat." *Id.* The following is the sole explanation Aguirre provided as to his determination that the writing constituted a terroristic threat:

> I made this determination based upon my knowledge of the ever increasing obligation to protect students since events like the Columbine High School incident in Colorado and the training I have received as an Administrator within the Socorro Independent School District with regard to protection and safety of students.

*Id.*

As a "terroristic threat," Aguirre determined that the writing violated the Student Code of Conduct, suspended E.P. from school for three days, and recommended that he be placed in the school's alternative education program at KEYS Academy.[4] *Id.* at para 9–10. Aguirre informed E.P.'s parents of this decision and of their right to appeal it. *Id.* at para 10. E.P.'s parents appealed the decision to the Principal of Montwood High School, the Assistant Superintendent of Instructional Services, and finally to the School Board's designated committee. Aguirre Aff. at para 10. Specifically, E.P.'s parents contested the finding that E.P. had violated the Student Code of Conduct and that he would have to attend KEYS Academy before returning to Montwood High School. Defendant asserts that the decision was upheld at each level, but provides no written decisions or transcripts for this Court's review. *Id.* at para 10; Ponce Aff. para 4. Rather than allowing SISD to place E.P. at KEYS Academy, E.P.'s parents transferred him to a private high school. Ponce Aff. para 2.

E.P.'s mother explained that the decision to transfer E.P. to a private school was based upon concern that the school's finding that E.P. made a terroristic threat and violated the Student Code of Conduct would become part of his permanent school record and follow him to any other district to which he might transfer. *Id.* at para 2. Such a record would require that E.P. attend an alternative education program, like that at KEYS Academy, and deprive E.P. of the ability to participate in musical education programs. *Id.* E.P.'s

---

**3.** The Court notes that Aguirre failed to identify the particular lines of concern—a curious omission considering the subject unidentified lines presumably were/are the basis of Defendant's decision to suspend and transfer E.P. from Montwood High School, the very subject of this lawsuit. The Court is therefore left with two alternatives: 1) assume or guess that Defendant based its decision upon on the entire work, or 2) self-identify those excerpts upon which the Court assumes or guesses Defendant might have based its decision. The Court declines to subjectively decide which lines are those that might have led Defendant to reach its decision, and will therefore consider the notebook in its entirety.

**4.** Notably, the day after reading the notebook, Aguirre called the El Paso Police Department and had E.P. arrested. Aguirre Aff. para 7; Pls.'s Resp. in Opp. to Def.'s Mot. to Dismiss or Alternatively for Summ. J., Aff. of Rocio Ponce para 3 ("Ponce Aff."). Nevertheless, after reviewing the case, the El Paso County Attorney's Office declined to prosecute the case. *Id.* at para 3.

mother worried that such action would affect E.P.'s ability to gain admission to the colleges of his choice, especially because he intends to major in music while attending college. E.P. Aff. para 20. Thus, in an effort to ensure that E.P. can return to Montwood High School with a clean record and participate in its musical education programs, E.P.'s parents filed the instant lawsuit in January 2006. Ponce Aff. para 4.

E.P. states that he does not share the beliefs of the character in his story. E.P. Aff. para 10–11, 16–17. Moreover, he states that many of the events that "occurred" in the story never really occurred as it is a work of fiction. *Id.* at para 14. Defendant has offered no evidence contradicting or supporting these statements or of any investigation taken thereafter, and further has offered no evidence regarding E.P.'s disciplinary history.

E.P. also states that since this incident he has had trouble sleeping. *Id.* at para 18. He often does not want to attend school because he is embarrassed about the entire incident. *Id.* Moreover, he is concerned because Aguirre called several of E.P.'s friends, telling them to stay away from E.P. because he is dangerous to them. *Id.* E.P. stated that, "I haven't tried to write any stories since then and I don't know if I want to do so anymore.... I don't feel comfortable writing anymore because I am afraid someone might misinterpret it and be offended and I would get in this kind of trouble again." *Id.* at para 18–19.

Based upon the foregoing, E.P.'s parents sued the school district, alleging viola-tions of E.P.'s First, Fourth, and Fourteenth Amendment rights, all of which are actionable pursuant to Title 42 U.S.C. § 1983, and for violating analogous provisions under the Texas Constitution.

## II. DISCUSSION

### A. Standards

Defendant has requested this Court dismiss the case under Federal Rule of Civil Procedure 12(b)(1), or alternatively under Rule 12(b)(6).[5] Plaintiffs have requested this Court issue a preliminary injunction enjoining Defendant from: (1) maintaining entries in E.P.'s school records indicating that he committed any infraction of law or of school regulations, (2) assigning E.P. to the KEYS Academy, (3) defaming E.P. by making false representations concerning E.P. to third parties or telling anyone that E.P. planned or intended to commit acts of violence upon any person, and (4) invading E.P.'s privacy and intellectual property rights by reading, disseminating, or discussing the contents of his writing without his consent.

### 1. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction. *Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the United States*, 362 F.3d 333, 336 (5th Cir. 2004). Without jurisdiction conferred by statute, federal courts lack the power to adjudicate claims. *Id.* A party may challenge a district court's subject matter jurisdiction by filing a motion to dismiss

---

**5.** In its motion, Defendant alternatively requests this Court to grant summary judgment in its favor. However, Plaintiffs' objection to such response is well-taken in that Defendant's Motion to Dismiss Pursuant to Rule 12b or Alternatively for Summary Judgment does not comply with this Court's standing order entitled "Standing Order Governing Motions for Summary Judgment." Accordingly, to the extent Defendant requests this Court to grant summary judgment, summary judgment is **DENIED** without prejudice to refiling said motion in compliance with this Court's standing orders.

pursuant to Rule 12(b)(1). FED.R.CIV.P. 12(b)(1).

A motion to dismiss pursuant to Rule 12(b)(1) must be considered before any other challenge, because a court must have jurisdiction before determining the validity of a claim. *Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 172 (5th Cir.1994). In ruling upon such motion, a district court is free to weigh the evidence and satisfy itself as to its power over the case. *MDPhysicians & Assoc., Inc. v. State Bd. of Ins.,* 957 F.2d 178, 181 (5th Cir.1992). In making this ruling, the district court may rely upon: (1) the complaint alone, (2) the complaint supplemented by undisputed facts in the record, or (3) the complaint supplemented by undisputed facts in addition to the court's resolution of disputed facts. *Barrera–Montenegro v. United States Drug Enforcement Admin.,* 74 F.3d 657, 659 (5th Cir.1996).

The standard of reviewing a motion to dismiss pursuant to 12(b)(1) depends upon whether the defendant makes a facial or factual challenge to the plaintiff's complaint. *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir.1981). When the defendant makes a facial attack by the mere filing of a Rule 12(b)(1) motion, the trial court looks to the sufficiency of the plaintiff's allegations, which are presumed to be true. *Id.* When the defendant makes a factual attack by providing affidavits, testimony, and other evidence challenging the court's jurisdiction, the Plaintiffs must submit facts in support of the court's jurisdiction and thereafter bear the burden of proving that the trial court has subject matter jurisdiction. *Middle S. Energy, Inc. v. City of New Orleans,* 800 F.2d 488, 490 (5th Cir.1986).

### 2. Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6), on the other hand, challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. FED.R.CIV.P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true, and view them in a light most favorable to the plaintiff. *Id.; Calhoun v. Hargrove,* 312 F.3d 730, 733 (5th Cir.2002). A court will dismiss a complaint pursuant to Rule 12(b)(6) only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *S. Christian Leadership Conference v. Supreme Court of the State of Louisiana,* 252 F.3d 781, 786 (5th Cir.2001).

### 3. Preliminary Injunction

A preliminary injunction is an extraordinary equitable remedy, designed "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway,* 489 F.2d 567, 576 (5th Cir.1974). In order to obtain a preliminary injunction, the moving party must make at least some showing of the following: (1) a substantial likelihood of success on the merits of the substantive claims, (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied, (3) that the threatened injury outweighs any damage the injunction might cause the non-moving party, and (4) that the injunction will not disserve the public interest. *Reliant Energy Servs. v. Enron Can. Corp.,* 349 F.3d 816, 826 n. 7 (5th Cir.2003) (citing *Hoover v. Morales,* 164 F.3d 221, 224 (5th Cir.1998)). All four elements are mixed questions of law and fact. *Hoover,* 164 F.3d at 224.

### B. Rule 12(b)(1) Motion to Dismiss

Defendant argues that Plaintiffs lack standing to bring this action pursuant to § 1983 because E.P.'s assignment to KEYS Academy does not constitute a de-

privation of rights. Def.'s Mot. 4. Defendant characterizes the decision to transfer E.P. as a purely administrative decision in response to E.P.'s terroristic threat, which administrative decision is authorized and required pursuant to Texas Education Code § 37.006(a)(1).[6] Def.'s Mot. 4–5. This argument lacks merit.

First and foremost, this Court notes that although Defendant challenges this Court's power to hear this case under Rule 12(b)(1), Defendant did not set forth the relevant standards for federal jurisdiction or standing. Moreover, Defendant relied on only two cases in support of its argument, neither of which stands for the proposition cited. Having so noted these deficiencies, the Court will nonetheless address Defendant's argument.

Pursuant to Title 28 U.S.C. § 1331, district courts have original jurisdiction over cases involving a "federal question"—that is, all civil actions arising under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331; *Okla. Tax Comm'n v. Graham,* 489 U.S. 838, 840, 109 S.Ct. 1519, 103 L.Ed.2d 924 (1989); *Hart v. Bayer Corp.,* 199 F.3d 239, 243 (5th Cir.2000). District courts determine whether or not a federal question exists by reference to the "well-pleaded complaint" rule. *Okla. Tax Comm'n,* 489 U.S. at 840, 109 S.Ct. 1519; Hart, 199 F.3d at 243–44. Per this rule, district courts examine the face of plaintiff's complaint, unaided by any information alleged in anticipation of defenses, and determine whether or not the complaint raises an issue of federal law. *Okla. Tax Comm'n,* 489 U.S. at 840–41, 109 S.Ct. 1519; *Hart,* 199 F.3d at 243–44.

In the instant case, Plaintiffs have alleged violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution enforceable under § 1983. Thus, the action, on its face, clearly arises under the Constitution and laws of the United States. *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 125 S.Ct. 2363, 2366, 162 L.Ed.2d 257 (2005) (specifically providing § 1983 as an example of a claim invoking federal question jurisdiction); *see also* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

---

**6.** Texas Education Code § 37.006 provides: "A student shall be removed from class and placed in a disciplinary alternative education program as provided by Section 37.008 if the student: (1) engages in conduct involving a public school that contains the elements of the offense of ... a terroristic threat under Section 22.07, Penal Code...." Texas Penal Code § 22.07 defines a terroristic threat in the following manner:

(a) A person commits an offense if he threatens to commit any offense involving violence to any person or property with *intent to:*

(1) cause a reaction of any type to his threat by an official or volunteer agency organized to deal with emergencies;

(2) place any person in fear of imminent serious bodily injury;

(3) prevent or interrupt the occupation or use of a building, room, place of assembly, place to which the public has access, place of employment or occupation, aircraft, automobile, or other form of conveyance, or other public place;

(4) cause impairment or interruption of public communications, public transportation, public water, gas, or power supply or other public service;

(5) place the public or a substantial group of the public in fear or serious bodily injury; or

(6) influence the conduct or activities of a branch or agency of the federal government, the state, or a political subdivision of the state.

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.")

Defendant next challenges Plaintiffs' standing to bring the instant suit. Defendant does not indicate expressly which element(s) of standing it challenges, an omission at least consistent with Defendant's failure to set forth the relevant standard. However, after a review of Defendant's Motion, this Court assumes that Defendant challenges Plaintiffs' ability to meet the first element of standing—the invasion of a legally protected interest.[7]

■ As a general rule, the party invoking federal jurisdiction bears the burden of establishing constitutional standing. *Int'l Ass'n of Machinists and Aero. Workers Local Lodge 2121 v. Goodrich Corp.*, 410 F.3d 204, 211 (5th Cir.2005) (citing *Grant v. Gilbert*, 324 F.3d 383, 387 (5th Cir. 2003)). The elements of constitutional standing are: (1) plaintiff has suffered an injury in fact—the invasion of a legally protected interest—which is concrete and particularized, and actual or imminent; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Int'l Ass'n of Machinists and Aero. Workers Local Lodge 2121*, 410 F.3d at 211. Furthermore, it is well-settled that "[s]tudents *and* parents may challenge unconstitutional actions in the public schools that directly affect the students." *Littlefield v. Forney*

*Indep. Sch. Dist.*, 268 F.3d 275, 284 (5th Cir.2001) (emphasis added).

■ In support of its position, Defendant relies upon two cases. First, Defendant cites *Nevares v. San Marcos Consol. Ind. Sch. Dist.*, 111 F.3d 25 (5th Cir.1997) for the proposition that E.P.'s assignment to KEYS Academy does not constitute a deprivation of rights for purposes of § 1983. In *Nevares*, a high school student sued the San Marcos Independent School District, challenging his transfer to an alternative education program and the constitutionality of Texas Education Code § 37.006(a). *Nevares v. San Marcos Consol. Ind. Sch. Dist*, 111 F.3d at 26. The police had detained the student for an aggravated assault that had taken place off campus. *Id.* After receiving the police report, the assistant principal questioned the student and thereafter determined the student should be transferred to an alternative education program pursuant to section 37.006. *Id.*

The student argued that the proposed transfer deprived him of property and liberty interests under the Fourteenth Amendment, but the Fifth Circuit disagreed.[8] *Id.* The Fifth Circuit found that the school district had not *deprived* the student access to a public education, but merely *transferred* him from one program to another. *Id.* at 27. The Fifth Circuit noted that no protected property interest is implicated in a school's denial of a particular curriculum or a school's transfer of a student to a different school for disciplinary reasons. *Id.* Accordingly, the Fifth

---

7. The Court reached this assumption because the two cases Defendant cited discussed the first element.

8. Although *Nevares* does not specifically cite the constitutional amendment under which the student brought suit, this Court infers from the "property and liberty interest" lan-

guage and the citation to *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), that the student sued under the Fourteenth Amendment. *See id.* at 574, 95 S.Ct. 729 (recognizing a student's entitled to public education as a property interest protected under the Fourteenth Amendment).

Circuit concluded that because the student's proposed transfer implicated no property interests, the student could not meet the first element of standing, and thus the federal court lacked jurisdiction to hear the case. *Id.*

The second case relied upon by Defendant, and cited to in *Nevares*, is *Zamora v. Pomeroy*, 639 F.2d 662 (10th Cir.1981). In *Zamora*, a school had allowed police to bring narcotics-detecting dogs onto the campus, and as a result, the police found marijuana in a student's locker. *Id.* at 664. After the school held a hearing on the matter, the student was transferred from his high school to the district's alternative education program. *Id.* The student challenged this action under § 1983 as a violation of his Fourth Amendment rights, but the Tenth Circuit rejected his argument. *Id.* at 670. The Tenth Circuit recognized that students who face temporary suspension from school have interests that may qualify for protection under the Fourteenth Amendment, and further that misconduct charges recorded on the student's record can damage his or her reputation and interfere with later educational and employment opportunities. *Id.* at 668. Nevertheless, the Tenth Circuit also found that because numerous hearings were held before the student was transferred, he was not deprived of an education. He was merely transferred, and because he was transferred for an undisputed and serious offense, the student suffered no injury in fact and therefore had no standing to bring suit. *Id.* at 670.

Both *Nevares* and *Zamora* are distinguishable from the instant case. E.P. does not merely contest his transfer to the KEYS Academy—he challenges the imposition of punishment in any form whatsoever for the exercise of his First Amendment rights. *Nevares* and *Zamora* both involved a school's disciplinary action for the student's *undisputed and clear* violation of a school policy. In the instant case, it is disputed whether or not E.P. committed a violation of section 37.006. Aguirre states that E.P. communicated threats to another student, yet in Defendant's own motion, Defendant states that "[t]he *writing itself* was considered a terroristic threat" under section 37.006. Def.'s Mot. 7 (emphasis added). E.P., on the other hand, states that he merely told another student about his story, which story is completely fiction.

Moreover, at some point the County Attorney's Office—comprised of people trained to interpret the law, make findings as to whether or not a specific action constitutes a "terroristic threat" under Texas law, and thereafter enforce said law—examined the facts of this situation and decided not to prosecute. Additionally, E.P. himself states that the story was mere fiction. Hence, there is some evidence that E.P. committed no violation at all and is merely being punished, and has been punished, for the content of his writing. In other words, unlike *Nevares* and *Zamora*, Plaintiffs have not asserted any procedural due process violations or complained that the transfer to KEYS Academy *itself* rises to a deprivation of E.P.'s rights. Rather, Plaintiffs contest the imposition of punishment, in any form, as a consequence of E.P.'s exercise of legally protected rights.

This Court finds that the instant facts are more analogous to those cases interpreting section 37.006, wherein courts have found that students have standing to challenge disciplinary actions. For example, in *Littlefield v. Forney Ind. Sch. Dist.*, 108 F.Supp.2d 681 (N.D.Tex.2000), students challenged the imposition of mandatory school uniforms under the First Amendment and § 1983. *Id.* at 685. The defendants argued that the plaintiffs lacked standing to bring suit because they had

not suffered any injury as a result of the implementation of the school's uniform policy. *Id.* at 688. The district court rejected this argument. *Id.* The court cited *Lopez* for the proposition that "where the state has statutorily created a right to a free public education, the state is 'constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause....'" *Id.* In Texas, students are entitled to a free public education, and are further required by state law to attend school. *Id.* (citing TEX. EDUC. CODE ANN. §§ 25.001, 25.085). Moreover, the sanction for refusal to comply with the school's uniform policy was either placement in the alternative education program or expulsion. *Id.* As such, the students' could potentially be deprived of their right to a public education for failing to comply with the school's uniform policy. Accordingly, the court found that the plaintiffs had established a particularized, imminent, and actual injury for purposes of Article III, and jurisdiction was proper. *Id.*

In another case, a district court similarly held that it could properly exercise jurisdiction over a suit challenging a school's disciplinary action. *Riggan v. Midland Ind. Sch. Dist.*, 86 F.Supp.2d 647, 654 (W.D.Tex.2000). In *Riggan,* a student took pictures of his school principal's car while it was parked in front of a teacher's house, after the principal had been accused of sexual improprieties. *Id.* at 650–51. Shortly thereafter, the principal accused Riggan of retaliation under Texas Penal Code section 37.006, alleging that Riggan took such pictures of the principal in retaliation for previous disciplinary actions. *Id.* at 651. Riggan was suspended for three days and transferred to the district's alternative education program. *Id.* at 651. After exhausting his administrative remedies, Riggan filed suit in federal court,

alleging violations of his First and Fourteenth Amendment rights. *Id.* at 654–55.

The district court rejected Defendants' argument that the dispute was a mere disciplinary matter not rising to constitutional dimensions. *Id.* at 653. Rather, the Court found that Riggan had asserted colorable constitutional violations properly heard in federal court. *Id.* at 654. In its discussion concerning standing, the court stated:

> Merely because this lawsuit arises in the context of a school disciplinary action does not automatically deprive federal courts of the jurisdiction to review potential constitutional violations. It is important to reiterate that students' constitutional rights do not end at the schoolhouse door. *See Tinker v. Des Moines Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In this case, Plaintiff Casey Riggan has asserted claims for denial of his First Amendment Free Speech rights, as well as Procedural and Substantive Fourteenth Amendment Due Process rights. While "it is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion," it is the role of federal courts to decide claims of constitutional violation. *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (denying jurisdiction after finding the dispute did not rise to the level of a violation of specific constitutional guarantees). If Riggan's claims amounted to no more than an attempt to "relitigate in federal court evidentiary questions arising in school disciplinary proceedings" this Court would decline jurisdiction. However, as stated above and discussed below, Riggan has

asserted constitutional claims sufficient to survive a Summary Judgment....

*Id.* at 653–54.

As in *Riggan* and *Littlefield,* this Court does not reject *Nevares,* but instead recognizes that *Nevares* does not control the issue of standing in this case. Plaintiff has asserted colorable claims for violations of his First, Fourth, and Fourteenth Amendment rights, just as the plaintiffs in *Riggan* and *Littlefield* asserted colorable violations of their constitutional rights. While this Court will not entangle itself in second-guessing the decisions of school officials based upon subjective personal disagreement, the Court is obligated to determine whether or not constitutional violations have occurred. To this end, this Court recognizes that, as so succinctly expressed in *Riggan,* a student's constitutional rights do not end at the schoolhouse door merely because an action arises in the context of a school disciplinary action. Accordingly, this Court holds that Plaintiffs, claiming that Defendant's decision violated E.P.'s recognized constitutional rights, have standing to bring this suit. Defendant's Rule 12(b)(1) motion is **DENIED.**

### C. Rule 12(b)(6) Motion to Dismiss

Defendant contends that Plaintiffs have failed to state a claim for relief under the First, Fourth, and Fourteenth Amendments. This contention lacks merit.

#### 1. First Amendment

█ The Fifth Circuit has acknowledged that "public school officials have broad discretion in the management of school affairs and that the courts should not lightly interfere with the 'daily operation of school systems.'" *Campbell v. St. Tammany Parish Sch. Bd.,* 64 F.3d 184, 188–89 (5th Cir.1995). However, the Fifth Circuit also recognizes that a school offi-cial's discretion in managing school affairs must be balanced against the United States Supreme Court's holding that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Ind. Cmty. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Campbell,* 64 F.3d at 189. In view of this delicate balance, the Supreme Court has issued several opinions setting forth guidelines on how to balance a student's First Amendment rights to free speech against a school's need to ensure the safety of its students. *Campbell,* 64 F.3d at 189. These opinions set forth three different categories of student speech accompanied by three different methods to analyze said speech. *Id.; see also Behymer–Smith v. Coral Acad. of Sci.,* 427 F.Supp.2d 969 (D.Nev.2006) (discussing three categories of student speech in the context of a request for a preliminary injunction to restrain a school board from violating a student's First Amendment rights).

The first category of student speech includes vulgar, lewd, obscene, and plainly offensive speech. *LaVine v. Blaine Sch. Dist.,* 257 F.3d 981, 988–89 (9th Cir.2001); *Porter,* 301 F.Supp.2d at 582. The Supreme Court addressed this first category of speech in *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), when it held that the First Amendment does not protect a student's vulgar speech at a school assembly. *Fraser,* 478 U.S. at 685, 106 S.Ct. 3159; *Porter,* 301 F.Supp.2d at 582 (discussing *Fraser* ). The Court held that the school district's act of punishing the student for his offensive and indecent speech was unrelated to any political viewpoint, and hence did not violate that student's First Amendment rights. *Fraser,* 478 U.S. at 685, 106 S.Ct. 3159.

The second category of student speech involves school-sponsored speech. *LaVine*, 257 F.3d at 988–89; *Porter*, 301 F.Supp.2d at 582. The Supreme Court addressed this second category of speech in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), when it held that school officials may censor the content of school newspapers. *Kuhlmeier*, 484 U.S. at 270–72, 108 S.Ct. 562. The Court held that the ability to participate in a school newspaper is part of a school's curriculum, regardless of whether or not it occurs within a traditional classroom setting, and that as such educators may properly exercise greater control over this form of student expression. *Id.* at 271, 108 S.Ct. 562.

Finally, the third category of speech includes all other speech that falls into neither of the categories above. *LaVine*, 257 F.3d at 988–89; *Porter*, 301 F.Supp.2d at 582. The Supreme Court addressed this third category of speech in *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), when it held that a school could not prohibit students from wearing black armbands to protest the Vietnam War. *Tinker*, 393 U.S. at 509–510, 89 S.Ct. 733. In explaining its holding, the Supreme Court stated the following:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker*, 393 U.S. at 508, 89 S.Ct. 733.

Defendant fails to classify which category of speech E.P.'s notebook falls into, and thereafter fails to apply the corresponding analysis. Defendant does not argue that the notebook is vulgar, lewd, obscene, or plainly offensive as contemplated by *Fraser*. Current Fifth Circuit law holds that *Fraser* contemplates "sexually explicit, indecent, or lewd speech" unrelated to any political viewpoint. *See Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 442 (5th Cir.2001) ("The Supreme Court, diverging from the *Tinker* analysis, held that it was appropriate for educators to protect students from sexually explicit, indecent, or lewd speech...." "[U]nlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in *Fraser* were unrelated to any political viewpoint."); *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir.1986) (including "indecent language and profanity" under the *Fraser* framework). Based on the record and pleadings before this Court, it does not appear as though the notebook contains sexually explicit, indecent, or lewd speech and this Court declines to make any argument on behalf of Defendant to the contrary.

Similarly, Defendant does not argue that the notebook is school-sponsored speech as contemplated by *Kuhlmeier*. Current Fifth Circuit law holds that *Kuhlmeier* contemplates speech that requires the school to affirmatively promote it. *See Canady*, 240 F.3d at 442 ("The Supreme Court concluded that the *Tinker* analysis does not apply when 'the First Amend-

ment requires a school affirmatively to promote particular student speech.' "); *Martin v. Parrish*, 805 F.2d at 585 (applying *Hazelwood* to "private speech which bears the imprimatur of the government"). Based on the record and pleadings before this Court, it does not appear as though the notebook is private speech that requires the school to promote its content and, again, this Court declines to make any argument on behalf of Defendant to the contrary.

Defendant does, however, imply that E.P.'s notebook falls into the third category of speech guided by *Tinker*, by relying on two cases that apply *Tinker*. Indeed, though Defendant identified the three different types of speech, Defendant, without argument, merely began its discussion of the notebook, citing two cases which apply *Tinker*. Based on the record and pleadings before this Court, it appears as though the notebook at issue is speech contemplated by *Tinker*—namely speech that falls into neither of the first two categories above. Accordingly, like Plaintiffs and Defendant, this Court will analyze the school's decision under *Tinker*.

Under *Tinker*, E.P.'s expression is protected unless it " 'materially and substantially' interfer[es] with the requirements of appropriate discipline in the operation of the school and [does not] collid[e] with the rights of others." *Tinker*, 393 U.S. at 513, 89 S.Ct. 733 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966)); *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1174 (9th Cir.2006). A school official's reasonable belief that the expression will cause disruption "must be based on fact, not intuition or the simple pronouncement of the superintendent or principal that disruption is likely to occur." *Riggan*, 86 F.Supp.2d at 661 (quoting *Tinker*, 393 U.S. at 509, 89 S.Ct. 733). "While we do not require school officials to be certain

that disruption will occur, ... they must present 'evidence that the ban is necessary to avoid *material* and *substantial* interference with schoolwork or discipline.' " *Harper*, 445 F.3d at 1193 (Kozinski, J., dissenting) (emphasis in original).

■ To meet its burden in demonstrating a reasonable belief that E.P.'s expression would materially and substantially interfere with the operation of the school, Defendant has provided two affidavits—only one of which contains any justification of its action. This single affidavit indicates that the disciplinary action take against E.P. was pure content-regulation, rather than a protective measure taken on behalf of the students. Specifically, Aguirre states that upon receiving the report concerning E.P.'s notebook, he called E.P. into his office and held a meeting wherein he discovered the notebook, read the notebook, and arranged for E.P.'s mother to join the meeting. During this meeting, Aguirre told E.P.'s mother that he "would read the notebook in detail and ... call her the next day with an administrative decision based on the safety and security of the student body." Aguirre Aff. para 7.

Nonetheless, immediately following this meeting, wherein Aguirre states that he strongly believed E.P.'s notebook constituted a threat to the student body justifying disciplinary action, Aguirre released E.P. from the meeting to return to class and complete the school day. *Id.* This Court is left pondering how Defendant can establish a reasonable belief that E.P.'s notebook would cause material and substantial disruption to the operation of the school, and that it was of such character so as to threaten the "safety and security [of] the students," when Aguirre immediately returned E.P. to the very population that E.P. had purportedly "terrorized." Instead, Aguirre's own action concedes the opposite—that E.P. did not commit a ter-

roristic threat through his story-telling. Moreover, this Court finds it equally curious that various re-readings of E.P.'s notebook could somehow transform the work to such a degree that it merited a change from Aguirre's relatively innocuous response of sending E.P. back to class, to having E.P. arrested by the police. Defendant provides no explanation, let alone rationale, for this drastic change of heart.

In similar cases, wherein courts have affirmed disciplinary actions in the name of student safety, administrators have taken *immediate* action to segregate potentially dangerous students from the rest of the student body. *See, e.g., LaVine,* 257 F.3d at 984–85 (affirming part of a school board's disciplinary action when the school board took immediate steps, including action on the weekend, to expel a student in an emergency proceeding based upon a genuine belief the student constituted a threat to the general student body). In other words, it makes no sense to this Court that an administrator who genuinely believes that a student constitutes a threat to the general student population, would then send that student back into the general student population immediately following the discovery of that student's plan to commit an attack against the school. If anything, this would appear to allow that student the perfect opportunity to carry out his plans or at least a portion thereof—before further action could be taken to stop him. However, the facts indicate that E.P. returned to class without incident, supporting E.P.'s argument that the story was, indeed, fiction.

Even assuming that Aguirre's action in returning E.P. to class could be rationally explained, this Court finds fault with the school's immediate re-characterization of the notebook as a terroristic threat with absolutely no supporting rationale. As stated above, the record contains sparse evidence that anyone who contributed to the decision of classifying E.P.'s writing as a terroristic threat is trained to identify the elements of what constitutes a terroristic threat under section 37.006, and then apply those elements to facts.[9] As stated in the background section to this opinion and rewritten here for convenience, the only justification or rationale for the school board's classification of E.P.'s writing as a terroristic threat consists of the following:

> There are several lines in the notebook that alarmed me as it applies to campus safety and security. I determined that in the interest of safety and security to the students and campus that the writing by E.P. was threatening and a danger to students. I viewed it to be a terroristic threat. I made this determination based upon my knowledge of the ever increasing obligation to protect students since events like the Columbine High School incident in Colorado and the training I have received as an Administrator within the Socorro Independent School District with regard to protection and safety of students.

Aguirre Aff. para 8.

The affidavit does not go on to describe the training that Aguirre has received as an administrator, nor the specific basis

---

9. By contrast, the record reveals that the only people trained in the interpretation and application of law, who examined the facts of this incident—the El Paso County Attorney's Office, decided not to prosecute the case. While this Court is cognizant of the myriad of reasons why prosecutors decide to exercise their broad discretion in refusing to prosecute cases, and does not rely upon the County Attorneys Office's decision not to prosecute the case as part of its decision, the Court nonetheless notes this fact to reinforce the inadequacy of the record for purposes of granting a 12(b)(6) motion as to the reasonableness of Aguirre's action.

that allowed Aguirre to conclude the notebook constituted a terroristic threat. The only evidence that has been presented to this Court is the conclusory statement that Aguirre felt the notebook was threatening and "viewed it to be a terroristic threat." In light of E.P.'s explanation of the notebook as a dramatic monologue, E.P.'s subsequent action (or more precisely inaction) after being sent back into class after discovery of his notebook, his lack of a disciplinary record, and his subsequent good behavior while attending a private school for the entirety of this past year, Aguirre's summary conclusion appears to be no more than mere intuition or a simple pronouncement. *See Riggan,* 86 F.Supp.2d at 661 (finding intuition and a simple pronouncement by a superintendent insufficient to satisfy *Tinker*). In short, the summary conclusion that E.P.'s writing constituted a terroristic threat that would "materially and substantially interfer[e] with the requirements of appropriate discipline in the operation of the school" was in no way "based on fact rather than intuition or a simple pronouncement." *Tinker,* 393 U.S. at 513, 89 S.Ct. 733; *Riggan,* 86 F.Supp.2d at 661; *Harper,* 445 F.3d at 1174. Thus, the summary conclusion cannot be said to have been reasonable in light of the evidence and the actions taken by administrators.

This analysis is supported by various cases applying the *Tinker* analysis in the context of student speech. For example, the Fifth Circuit applied the *Tinker* analysis in *Shanley v. Ne. Ind. Sch. Dist.,* 462 F.2d 960 (5th Cir.1972) when a school board decided to suspend several students who distributed an underground newspaper, and enter negative marks in their permanent records, for allegedly violating a school board policy. *Shanley,* 462 F.2d at 964, 967. Each of the students was otherwise considered a "good student" and the distribution was polite and orderly, it involved no disruption of class, and it occurred after school hours. *Id.* at 964. Moreover, the district court described the underground newspaper as "one of the most vanilla-flavored ever to reach a federal court." *Id.* Nonetheless, the school board considered the distribution of the newspaper to violate its policy against disseminating printed documents without school board approval. *Id.* at 964–65. The Fifth Circuit held that the school board's action was unconstitutional in that it prohibited and punished presumptively protected First Amendment expression that took place off campus and involved no disruption of school activities. *Id.* at 975. It held that student expression cannot be prohibited solely because students, teachers, administrators, or parents disagree with its content, and further that "the purpose of education is to spread, not to stifle, ideas and views." *Id.* at 970, 972. The Fifth Circuit quoted from *Tinker,* and noted that the function of free speech is to invite dispute, even if it stirs people to anger. *Id.* at 973.

Similarly, in *Boman v. Bluestem Unified Sch. Dist. No. 205,* 2000 WL 297167, 2000 U.S. Dist. LEXIS 5389 (D.Kan.2000), a district court sitting in Kansas applied *Tinker* when analyzing a school board's decision to discipline a student after she created a poster containing phrases such as, "I'll kill you if you don't tell me who killed my dog" and "I'll kill you all!," and subsequently hung it on a door in a school hallway. *Bowman,* 2000 WL 297167, *1, 2000 U.S. Dist. LEXIS 5389 at *2. Acting upon his belief that the phrases were threatening, the school principal suspended the student for five days and then held a hearing to determine whether long-term suspension or even expulsion was merited. *Id.* 2000 WL 297167, *1, 2000 U.S. Dist. LEXIS 5389 at *3. The hearing officer concluded that no such discipline was war-

ranted because there was no indication of malicious intent, especially in light of the student's explanation of the poster and her lack of intent to threaten or intimidate others. *Id.* 2000 WL 297167, *2, 2000 U.S. Dist. LEXIS 5389 at *6. However, the school board declined to adopt the hearing officer's recommendation and instead ordered that the student undergo a psychological evaluation before returning to school. *Id.* 2000 WL 297167, *2, 2000 U.S. Dist. LEXIS 5389 at *7. The district court determined that there were two essential questions to answer: 1) what was the student's intent and state of mind in creating and posting the poster, and 2) was the poster likely to materially disrupt the operation of the school or interfere with the rights of others? *Id.* 2000 WL 297167, **3–4, 2000 U.S. Dist. LEXIS 5389 at *10–11. The court found that the school board failed to provide any evidence suggesting the student acted in bad faith, and stipulated that the student believed her poster was a work of art. *Id.* 2000 WL 297167, *3, 2000 U.S. Dist. LEXIS 5389 at *10. The court further found that "once the school district gathered the facts, and the context of the poster and the statements in it became clear, there simply was no longer a factual basis for believing that the poster constituted any sort of threat." *Id.* 2000 WL 297167, *4, 2000 U.S. Dist. LEXIS 5389 at *12. Thus, the district court found that the plaintiff was likely to succeed in proving that the school board violated her First Amendment rights, all the while acknowledging the difficulties faced by schools in light of recent episodes of student violence. *Id.*

Finally, in *Finkle v. Bd. of Educ. of Syosset Cent. Sch. Dist.,* 386 F.Supp.2d 119 (E.D.N.Y.2005), a district court sitting in New York applied *Tinker* in analyzing a school board's decision to discipline a student when he, as part of a writing assignment, kept a journal in which the main character killed other characters, including several named after actual students, and then read the journal aloud in his class. *Id.* Though he had no prior disciplinary record, the school board initially suspended him for five days, and then suspended him again for thirty days, after receiving statements from students describing their reaction to the student's story. *Id.* at 123–24. The district court held that the school board's disciplinary action was merited, and hence did not violate the First Amendment, because the student's graphic descriptions of killing real-life students had a potential for materially interfering with the school's work by disturbing the teachers and students. *Id.* at 126.

All three of these cases support this Court's analysis, though for different reasons. For instance, as in *Shanley* and *Boman,* E.P. was punished for authoring a document that was characterized by administrators as containing inappropriate messages and/or dealing with inappropriate subject matter. Moreover, as in both *Shanley* and *Boman,* this message was published to at least one other person. Nevertheless, after gathering the facts and conducting a brief investigation, Defendant knew the following, at least: 1) E.P. was a good student without any history of disciplinary action having been taken against him, 2) E.P. disavowed any of the viewpoints expressed in the notebook, 3) there were no incidents involving E.P. following his immediate release into the general student population, and 4) none of the events involving the pseudo-Nazi party as described in the notebook, at least according to the record before the Court, have or had actually occurred.

For example, the record contains no evidence either corroborating or denying the following events and/or "facts" from the notebook:

- My first group [of Nazi followers] was at about 20 members or so.... My test for [loyalty] was the burning of a cross.... My group had increased from 20 to about 50 members.... My group had increased by 20 more members.... Having my Nazi Party reaching about 80 members I have given ranks to those who have been in the Party the longest.... Now, with all three schools combined [referring to Montwood High School, Eastwood High School, and Hanks High School], I have around 200 members.

- I had noticed that there was a specific boy in school was [sic] flirting with Adrianna. By the look on her face it was a safe bet that she looked annoyed. I had ordered that someone find out the phone number of this kid. Using his own number against him I found where he lived.... I had ordered that 4 of my members go to this address and break all of his windows with a brick containing a letter that read: "I have noticed that you have been around Adrianna lately and I don't like it. Back off or else I will strike again and again until you stop...." I'm glad to hear today that the mission was successful.... Discovering that Adrianna had gotten slaped [sic] by the same guy that I had threatened I ordered his pain. I can't say that my storm troopers overdid the job. They had broken both of his arms, 3 fingers, and a very noticable [sic] black eye.

- ... I decided that it might be a good idea to hunt down all of my enemies and anyone who had a grudge against me. I had dilivered [sic] my first speech using the committe [sic] I was in. I might say that the school officials were not happy with me.... Not only are my fellow classmates against me but also those who work at the school. Word of my Nazi Party has gotten out and security has tightened. Fortunately, my identity still remains safe within the members of the Party. It has come to my knowledge that a few people have been caught and interrogated. I know now that as a fact that my troops are loyal to me for they haven't said who their leader is.... Though, security is still looking for us, we must remain careful. They still want to know who broke into Mr. Browns [sic] office and the Nazi Party is on the suspect list. To me, it's kind of funny knowing that the school officials are after me. They are under the impression that the Nazi Party is a mere gang. They do not know that I have about 130 members now, and that they will strike at the drop of a hat at my command.... Security at school is so tight that they have started to pull random people and start interigating [sic] them. This dilema [sic] has not shown on the news for the school does not want any attention brought to it.

- So far, about 15 people have been hurt or badly injured by my Nazi Party.

- It seemed to me that I had given a speech to about 50 people or so. Out of dumb luck only 20 people had refused to join. I had gotten 30 new members to my Nazi Party. The 20 that had refused cursed at me and said I was crazy. Though the others had shut them up quite quick.... Luckily, nobody knew each other therefor the 20 rebels could not tell anyone who I was. My identity was still safe ...

- There is one particular person who finds interest in finding out who I am. For my own safety I must get rid of him. I don't know his first name but his last name is Brown. Mr. Brown has been put in charge of what they

are calling operation "Swastika". [sic] "Swastika" is supposed to find me and put a stop to my Nazi Party.... I had to get Mr. Brown off my back. (The next day) It's 3:45, school just ended and I have given an order.... I have created operation "Bad Boy". [sic] This mission meant that 2 to 3 people would have to get into Mr. Browns [sic] office. Intelligents [sic] reports tell me that Mr. Brown was working on a very important project given to him by the district itself.... [T]he [Nazi] officer, who was really smart, implanted a virus into Mr. Browns [sic] computer. The operation had taken less than 10 minutes. In the next couple days, intelligents [sic] reports informed me Mr. Brown had gotten fired.

- This morning there had been an announcement saying that the leader turn himself in. "Attention all students, any student found guilty of anything to do with the Nazi Party will be fined $50–$200 dollars. [sic] Any members who are caught from now on will be fined $500–$1,000 dollars. [sic] This next anouncement [sic] goes to the leader. We know you can hear us, give yourself up. You will be arrested and charged. If you turn yourself in, we will make sure you get a lighter sentence."

- I have been successful in stretching my Nazi Party to other schools now. Eastwood and Hanks.

- The top major of the ROTC program has started a "all American" [sic] club. So, we went after him. I got my storm troopers to get him on the floor He had resisted viciously. Trying to convince him to give up his club, we had to take action. I took his little brother and put the knife to his stomach. An officer did the same to the dog. Of course, we were wearing masks. He finally gave up and agreed. Sure he told people, but what good did it do if he didn't know who we were.

- A security gaurd [sic] has found one of my members doing his job. 4 members were torturing a guy that someone had wanted taken care of. A security officer had shown up and fought the 4 members. Although he should be saying he's not with the Nazi Party, they probably think that he's lying because of our trouble. Regardless, he should still be telling them that he's not with the Nazi Party. If he gets a ticket, we should be able to pay it off with our Nazi bank account.

- Already have I ordered my troops to brutully [sic] injure two homosexuals and seven colored people.

- We were talking in class and some guy wouldn't shut up about how "He" will defeat my army. Today, I ordered that his house be set on fire. Unfortunately, they [illegible] the fire too soon and put it out.

Def.'s Mot. Ex. 1A.

Not only does the record conspicuously lack any evidence corroborating or denying the above-listed events and/or "facts," but it also lacks any reference to any sort of investigation into the events and/or "facts" whatsoever. Thus, based upon the record, it appears to this Court that "once the school district gathered the facts, and the context of the [notebook] and the statements in it became clear, there simply was no longer a factual basis for believing the [notebook] constituted any sort of threat." *Bowman,* 2000 WL 297167, *4, 2000 U.S. Dist. LEXIS 5389 at * 12.

Furthermore, even though the *Finkle* court upheld the school board's disciplinary action taken against a student in re-

sponse to the creation of a journal depicting harm to characters named after real students, the instant case is distinguishable. In *Finkle,* the student made repeated requests to disseminate his story and read it to other students in class, a fact noticeably absent from the current record. Moreover, in *Finkle,* the school board took statements from various students describing their reaction to the plaintiff's story that specifically demonstrated a potential for material and substantial disruption in running the school. In this case, the record contains no such evidence that Defendant made an effort to ensure that its decision was based on more than Aguirre's mere pronouncement that the notebook was a terroristic threat. The record merely reflects that a student informed a teacher about the notebook, and the teacher in turn informed Aguirre about the notebook. There are no statements indicating either the student's or teacher's response to hearing about the notebook. Indeed, the only admissible statement relevant to the communication between E.P. and the informing student is E.P.'s assertion that he told the student he was writing a story. At the very least, in combination with the Defendant's unsupported argument that E.P. communicated threats to the informing student, this creates a disputed issue which must be resolved in favor of the non-moving plaintiff.

Defendant relies upon *Porter v. Ascension Parish Sch. Bd.,* 301 F.Supp.2d 576 (M.D.La.2004) and *LaVine v. Blaine Sch. Dist.,* 257 F.3d 981 (9th Cir.2001) for the proposition that E.P.'s discipline was justified because "[t]he writing itself was considered a terroristic threat." Aside from the obvious lack of discussion regarding the Texas statute at issue, neither of these cases stand for the proposition cited. For example, in *Porter,* a district court sitting in Louisiana denied First Amendment protection for a student drawing which depicted a high school being soaked with gasoline and surrounded by someone with a torch and a missile and students holding guns and throwing bricks at the school. *Porter,* 301 F.Supp.2d at 580. The court held that the evidence demonstrated that material and substantial disruption had already occurred as a result of the drawing, specifically pointing to the following facts: 1) a young girl on a school bus screamed that the high school was going to be burned down after seeing the drawing, 2) administrators had to suspend the student and hold meetings with his mother, and 3) a box cutter was found in the student's wallet. *Id.* at 586.

Unlike *Porter,* however, this case does not contain such a strong record of evidence. There is no admissible evidence that other students became aware of the notebook and reacted adversely, other than the bare fact that a student informed another teacher that the notebook had been written. In addition, while administrators had to hold a meeting with E.P. and his mother, this meeting revealed to administrators that E.P. denied any truth to the notebook, and what is more telling, did not misbehave or lash-out at anyone after his immediate release into the general student population. Finally, E.P. had no weapons or objects that could be used as weapons on his person, and denied that any of the events which occurred in the notebook had actually occurred. Again, Defendant has failed to provide any information as to whether the incidents within the notebook were investigated, let alone corroborated. The record indicates that Aguirre spoke with E.P.'s friends to warn them that he might be dangerous to them, but failed to include any evidence that administrators attempted to ask these friends about E.P., his behavior, or any involvement he might have in a pseudo-Nazi group. Aside from leaving this Court

to ponder exactly why Defendant failed to investigate if it felt so strongly that the safety of its students was in jeopardy, this dearth of information regarding any investigation does not support Defendant's Rule 12(b)(6) Motion.

Similarly, *LaVine* fails to support Defendant's position. In *LaVine*, the Ninth Circuit denied First Amendment protection to a student poem that contained images of death and suicide and which the student had shown to some of his friends and asked one of his teachers to read. *LaVine*, 257 F.3d at 984. This student had a history of family problems, had recently broken up with his girlfriend whom he was also allegedly stalking, and had missed school a short time before sharing the poem. *Id.* In applying the *Tinker* analysis, the Ninth Circuit noted that the poem itself was filled with imagery of death and suicide, but that its ultimate decision had to be based upon the poem in light of the totality of this student's circumstances. *Id.* at 989–90. While the Ninth Circuit rejected First Amendment protection for the poem and thus upheld the student's expulsion, it nonetheless held that the placement of a negative mark in the student's record would unnecessarily harm his chances for future employment. *Id.* at 992.

Again, unlike *LaVine*, the record is not replete with any of the evidence that helped support the Ninth Circuit's conclusion in *Tinker*. In fact, even considering that student's long history of disciplinary and family problems, the Ninth Circuit still stated that *LaVine* was a "close case." *Id.* at 982. The Ninth Circuit acknowledged that in light of Columbine and similar incidents, "[s]chools must be safe, but they are educational institutions after all, and speech—including creative writing and poetry—is an essential part of the edu-

cational fabric." *Id.* Accordingly, *LaVine* does not support Defendant's position.

This Court recognizes that "the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." *Harper*, 445 F.3d at 1176 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988)). However, public schools are designed to bestow upon our children a full and fair education, embracing diverse and often contentious viewpoints. *Id.* at 1174. Based on the record before this Court, the evidence is simply insufficient to prove that Defendant acted based upon a reasonable belief that disruption would occur. Accordingly, Defendant's Rule 12(b)(6) Motion to dismiss Plaintiffs' First Amendment claims is **DENIED.**

## 2. Fourth Amendment

The United States Supreme Court has held that under the Fourth Amendment, by virtue of the Fourteenth Amendment, a search conducted without a warrant issued upon probable cause is *per se* unreasonable, with a few specific exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). One of these specific exceptions, to both the warrant and probable cause requirements, occurs when a subject consents to the search. *Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041 (citing *Davis v. United States*, 328 U.S. 582, 593–594, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); *Florida v. Jimeno*, 500 U.S. 248, 250–251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)) ("[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have

been permitted to do so.") After consenting, it is the duty of the person claiming Fourth Amendment protection to limit the scope of a search if he so intends. *United States v. Mendez,* 431 F.3d 420, 427 (5th Cir.2005); *United States v. Mendoza–Gonzalez,* 318 F.3d 663, 667 (5th Cir.2003). Failure to object to the breadth of the search is considered an indication that the search remained within the scope of the initial consent. *Mendez,* 431 F.3d at 427; *Mendoza–Gonzalez,* 318 F.3d at 667 ("If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way.").

 Moreover, in the context of a school setting, the Supreme Court has held that the substantial need of administrators to maintain order in schools, when balanced against the privacy interests of school children, does not require strict adherence to the traditional notions of Fourth Amendment probable cause in justifying searches. *N.J. v. T.L. O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Instead, the Supreme Court has held that a search conducted by school administrators will be justified at its inception when there are reasonable grounds for suspecting that the search will reveal evidence that the student has violated the law or school rules, and further that the scope of a search will be reasonable when it is conducted in a manner reasonably related to the objectives of the search and not excessively intrusive in light of the student's age and gender. *Id.* at 341–42, 105 S.Ct. 733.

 In the instant case, E.P. admits that he initially consented to the search, but argues that the search later exceeded the scope of his consent. Under well-established Fourth Amendment jurisprudence therefore, the search, at least at its inception, was reasonable. Moreover, there is no indication in the record that E.P. attempted to limit the scope of the search. As it was his burden to do so, and E.P. has presented no evidence other than bare assertions in his affidavit that he never gave Aguirre permission to read the notebook, take it, or show it to anyone else, E.P. has failed to meet his burden of showing that the scope of the search was unreasonable.

Nevertheless, even if this Court were to assume that E.P. did not consent to the search, the search was conducted by a school administrator on school grounds. It is well-settled that school officials are allowed great latitude in their searches of students, and that such searches are justified when there are reasonable grounds for suspecting the search will turn up evidence of a violation of school rules or the law. *T.L.O.,* 469 U.S. at 340, 105 S.Ct. 733. In the instant case, it is undisputed that a teacher informed Aguirre that E.P. was in possession of a notebook containing a story about a pseudo-Nazi group planning an attack against Montwood High School. This Court finds that, in light of the great deference given to school administrators in the context of school searches, such notice provided Aguirre with reasonable grounds for suspecting that his search would turn up evidence of a violation of school rules or the law.

Based upon the foregoing, Defendant's Rule 12(b)(6) Motion to dismiss Plaintiffs' Fourth Amendment claims is **GRANTED.**

### 3. Fourteenth Amendment—Substantive Due Process

Deprivations of liberty in the school context may implicate both procedural and substantive due process concerns under the Fourteenth Amendment. *Hassan v. Lubbock Ind. Sch. Dist.,* 55 F.3d 1075, 1080–1081 (5th Cir.1995). A student's rights under the Fourteenth Amendment,

however, may be circumscribed by a school official's need to maintain order and discipline by taking some immediate action to discipline a student. *Id.* at 1081. However, "punishment does not implicate substantive due process concerns unless the action is 'arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning.'" *Id.*

In the instant case, this Court notes that neither party set forth the appropriate standard for analyzing a substantive due process claim under the Fourteenth Amendment. In addition, neither party specifically pointed to a "liberty interest" at issue such that it might trigger a Fourteenth Amendment analysis. In their response to Defendant's Motion, Plaintiffs cite to the case of *Jefferson v. Ysleta Ind. Sch. Dist.,* 817 F.2d 303, 305–06 (5th Cir. 1987) for the proposition that E.P.'s punishment, including his transfer and the negative marks entered into his permanent record, was based upon a finding that he committed a terroristic threat, which finding was arbitrary and capricious, and therefore violative of E.P.'s Fourteenth Amendment rights. Plaintiffs, however, fail to provide any law, let alone argument, that the punishment received by E.P. was that contemplated under *Jefferson.* *See, e.g. Hassan,* 55 F.3d at 1081 (discussing student's placement in juvenile holding cell); *Jefferson,* 817 F.2d at 305–06 (discussing teacher's action of tying student to a chair); *Woodard v. Los Fresnos Ind. Sch. Dist.,* 732 F.2d 1243, 1244 (5th Cir. 1984) (discussing student's choice of three strikes with the paddle as punishment). Accordingly, the Court refuses to speculate as to, or create, Plaintiffs argument on this matter.

Based upon the foregoing, Defendant's Rule 12(b)(6) Motion to dismiss Plaintiffs'

Fourteenth Amendment claims is **GRANTED** with leave to amend.

### D. Motion for Preliminary Injunction

■ Traditionally, a moving party is required to meet four elements in order to obtain a preliminary injunction, including: (1) a substantial likelihood of success on the merits of the substantive claims, (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied, (3) the threatened injury outweighs any damage the injunction might cause the non-moving party, and (4) the injunction will not disserve the public interest. *Reliant,* 349 F.3d at 826 n. 7; *Karaha Bodas Co. v. Negara,* 335 F.3d 357, 364 (5th Cir.2003). In the Fifth Circuit, district courts may also use a "sliding scale" approach to the issuance of preliminary injunctions. *Seatrain Int'l, S.A.,* 518 F.2d at 180; *Siff v. State Democratic Executive Comm.,* 500 F.2d 1307, 1309 (5th Cir.1974) ("Plaintiffs-appellants are of course correct that a sliding scale must be applied in considering the probability of plaintiffs' winning on the merits and plaintiffs' irreparable injury in the absence of interlocutory relief."); *see Apple Barrel Prod., Inc. v. Beard,* 730 F.2d 384, 389 (5th Cir.1984) ("[T]he sliding scale analysis recognizes an interdependence among the four factors . . . .") Under this sliding scale approach, the importance of showing a substantial likelihood of success on the merits varies significantly, depending upon the magnitude of the injury the movant will suffer in the absence of a preliminary injunction. *Id.* In other words, under the sliding scale approach, "none of the four prerequisites has a fixed quantitative value" . . . . a sliding scale is utilized, which takes into account the intensity of each in a given calculus. *Id.* For example, if there is only slight evidence that the movant will be injured in the absence of an injunction,

a strong showing of substantial likelihood of success on the merits is necessary. *Callaway,* 489 F.2d at 576.

As discussed above, Plaintiffs have failed to establish any likelihood of success on their claims under the Fourth and Fourteenth Amendments. Accordingly, the Court cannot issue an injunction as to those claims. *Seatrain Int'l, S. A.,* 518 F.2d at 180 ("[T]he injunction should never issue if there is no chance that the movant will eventually prevail on the merits.") The question remains, however, whether or not the Court will issue an injunction as to the *First Amendment claims.*

This Court has held that Plaintiffs have succeeded in stating a claim under the First Amendment. This Court further holds that Plaintiffs have succeeded in showing a substantial likelihood of success on the merits. Defendant was required to show that it had a reasonable basis to believe that E.P.'s expression would materially and substantially interfere with the operation of the school. *Tinker,* 393 U.S. at 513, 89 S.Ct. 733. However, the facts reveal that after reading E.P.'s notebook, Aguirre did not take immediate action to segregate him from the general student population and that E.P. denied any truth to or belief in the contents of the notebook, professing instead that it was part of a creative writing project. Other than Aguirre's conclusory statement that he based his decision upon "the training I have received as an Administrator within the Socorro Independent School District with regard to protection and safety of students," the record is devoid of any evidence indicating that he has been trained in the elements of what constitutes terroristic threat. Instead, it is clear that Aguirre's decision was based on nothing other than mere supposition or base reaction. It appears to this Court, at least on the record before it, that E.P.'s punishment was based purely on the fact that administrators disagreed with the content of his writing and nothing more. While this Court cannot say with certainty that Plaintiffs will actually prevail on the merits, such determination would be possible only after a full evidentiary trial on the merits, and it is sufficient for a preliminary injunction that Plaintiffs prove a likelihood of success. *Lakedreams v. Taylor,* 932 F.2d 1103, 1109 (5th Cir.1991) ("A final determination is possible only after a full evidentiary trial on the merits.")

Even if this Court were to conclude that Plaintiffs made only a minimal showing of likelihood of success on the merits, under the sliding scale approach adopted by the Fifth Circuit, the preliminary injunction would nevertheless issue. The record reveals that E.P. desires to major in music when he attends college, but that the requirement he attend KEYS Academy, an entry into his permanent record indicating that he committed an infraction of law or school regulations, and/or the dissemination of the notebook attributing its contents to E.P. might, and probably will, seriously affect E.P.'s ability to gain admission to the colleges of his choice. While Defendant attempts to characterize Plaintiffs' injury as the denial of access to extracurricular activities, this characterization is overly simple, and as can be seen, does not address each harm that Plaintiffs will suffer absent an injunction.

More importantly, Plaintiffs have alleged a violation of E.P.'s First Amendment rights. "Even a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm." *Nat'l People's Action v. Vill. of Wilmette,* 914 F.2d 1008, 1013 (7th Cir.1990) (cited in *Campbell v. Miller,* 373 F.3d 834, 840 (7th Cir.2004)); *see Se. Promotions, Ltd. v. Mobile,* 457 F.2d 340, 341 (5th Cir.

1972) ("[W]e cannot countenance this prior restraint on freedom of speech and irreparable harm and damage will ensue, if we do not order the District Court to enter the injunction and other relief which is sought by plaintiff.") Thus, Plaintiffs have made a strong showing of irreparable injury that, when combined with the showing of likelihood of success on the merits, is sufficient to warrant a preliminary injunction.

As to the third element, this Court finds that the threatened injury to Plaintiffs outweighs any damage the injunction might cause Defendant. Defendant argues it would suffer harm by allowing E.P. back into Montwood High School at this point because E.P.'s personal writings "admit" he does not have control over his anger. However, Defendant does not deal with the possibility, or even mention the fact, that E.P. claims that the work is entirely fiction and the fact that E.P. has had no other disciplinary problems. Moreover, Defendant has already stated that it would be willing to accept E.P. back into Montwood High School at some point, provided that he attend KEYS Academy first. The fact that Defendant would permit a terrorist to attend KEYS Academy, presumably where other students attend school, belies Defendant's suggestion that it might suffer irreparable harm. In light of these facts, the Court finds that the severe harm to E.P. and his chances of obtaining a higher education outweigh the speculative harm to Defendant.

Finally, this Court finds that the injunction will not disserve the public interest. E.P. has been enrolled in a private school in the community without incident all year. He has no history of disciplinary problems and disclaims any of the beliefs described in the notebook. Therefore, this Court can find no reason, and Defendant has provided no reason, as to why an injunction would disserve the public interest. On the contrary, a preliminary injunction in this case would further the public interest by vindicating the First Amendment rights of a United States citizen. After all:

> Although schools are being asked to do more to prevent violence, the Constitution sets limits as to how far they can go. Just as the Constitution does not allow the police to imprison all suspicious characters, schools cannot expel students just because they are 'loners,' wear black and play video games. [citations omitted] Schools must achieve a balance between protecting the safety and well-being of their students and respecting those same students' constitutional rights.

*LaVine*, 257 F.3d at 987.

Based upon the foregoing, Plaintiff's Motion for a Preliminary Injunction is **GRANTED.**

### III. CONCLUSION

Because Defendant's provided no evidence aside from the notebook and the Aguirre affidavit, this Court can only examine the notebook and the Aguirre affidavit in ruling on the instant matter. This evidence is simply insufficient to grant the relief requested by Defendant, and further is insufficient to satisfy Defendant's burden in showing that its action was reasonable under *Tinker*. Accordingly, Defendant's Motion (Doc. No. 25) is **DENIED** as to the issues of standing and the First Amendment and **GRANTED** as to the issues of the Fourth and Fourteenth Amendments. Plaintiff's Motion (Doc. No. 22) is **GRANTED.**

**IT IS THEREFORE ORDERED** that Defendant, its officers, agents, servants, employees, attorneys, and all persons acting in concert with them be restrained from the following activities:

1. Maintaining entries in E.P.'s school record indicating that he committed any infraction of law or of school regulations with regard to the notebook in question,

2. Assigning E.P. to the KEYS Academy,

3. Making false representations concerning E.P. to third parties or telling anyone that E.P. planned or intended to commit any acts of violence upon any person whomsoever, and

4. Disseminating or discussing the contents of E.P.'s notebook without his consent.

**IT IS FURTHER ORDERED** that Plaintiffs shall post a nominal bond of one hundred dollars ($100.00) because the evidence indicates that Defendant will suffer little, if any, damage by the issuance of this preliminary injunction. *See Behymer–Smith,* 427 F.Supp.2d 969 (allowing $100.00 bond in similar case).

**SO ORDERED.**